## *PRELIMINARY PRINT*

## VOLUME 601 U. S. PART 1
### PAGES 1–22

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

DECEMBER 5, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

ACHESON HOTELS, LLC *v.* LAUFER

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FIRST CIRCUIT

No. 22–429.   Argued October 4, 2023—Decided December 5, 2023

The Court granted review in this case to consider whether Deborah
Laufer has Article III standing to sue hotels whose websites failed to
state whether they have accessible rooms for the disabled as required
by the Americans with Disabilities Act of 1990, even if Laufer had no
thought of staying at the hotels, much less booking a room.   After a
lower court sanctioned her lawyer, Laufer voluntarily dismissed her
pending suits, including her case against Acheson Hotels, LLC, and filed
a suggestion of mootness in this Court.   Though Laufer's case is moot,
the circuit split on the issue briefed and argued in this Court is very
much alive.

*Held*: This case is vacated as moot.   The Court has the authority to ad-
dress jurisdictional issues of mootness and standing in any order it
chooses.   See *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549
U. S. 422, 431.   And while the Court is sensitive to Acheson's concern
about litigants manipulating this Court's jurisdiction, the Court is not
convinced that Laufer abandoned her case in an effort to evade the
Court's review.   Pp. 4–6.

50 F. 4th 259, vacated and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and ALITO, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ.,

1

joined. THOMAS, J., *post*, p. 6, and JACKSON, J., *post*, p. 14, filed opinions concurring in the judgment.

*Adam G. Unikowsky* argued the cause for petitioner. With him on the briefs were *Lindsay C. Harrison, Sally A. Morris,* and *Andrianna D. Kastanek.*

*Erica L. Ross* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Prelogar, Assistant Attorney General Clarke, Deputy Solicitor General Fletcher, Bonnie I. Robin-Vergeer,* and *Yael Bortnick.*

*Kelsi Brown Corkran* argued the cause for respondent. With her on the briefs were *Rupa Bhattacharyya, Amy L. Marshak,* and *Joseph W. Mead.*\*

———————

\*Briefs of *amici curiae* urging reversal were filed for the Atlantic Legal Foundation et al. by *Lawrence S. Ebner* and *Sarah Elizabeth Spencer*; for The Buckeye Institute et al. by *Larry J. Obhof, Jr., Robert Alt,* and *David C. Tryon*; for the Center for Constitutional Responsibility by *Steven P. Lehotsky, Andrew B. Davis, Karen R. Harned,* and *Drew F. Waldbeser*; for the Chamber of Commerce of the United States of America et al. by *Mark A. Perry, Jennifer B. Dickey, Jonathan D. Urick,* and *Thomas Pinder*; for the Restaurant Law Center et al. by *Dylan B. Carp* and *Angelo I. Amador*; and for the Retail Litigation Center, Inc., et al. by *Shay Dvoretzky, Parker Rider-Longmaid, Michael W. McTigue, Jr., Meredith C. Slawe, Jeremy Patashnik, Deborah R. White,* and *Jason D. Russell.*

Briefs of *amici curiae* urging affirmance were filed for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for Disability Antidiscrimination Law Scholars by *Hyland Hunt* and *Ruthanne M. Deutsch*; for the Disability Rights Education & Defense Fund et al. by *Karla Gilbride, Amy Farr Robertson,* and *Maria Michelle Uzeta*; for Fair Housing Organizations et al. by *Reed Colfax, Lila Miller, Gemma Donofrio, Daniel Woofter,* and *Diane L. Houk*; for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Janai S. Nelson, Samuel Spital, Christopher Kemmitt, Michael Skocpol, David D. Cole, Sunu P. Chandy, Rachel E. Smith, Damon Hewitt, Jon Greenbaum, Thomas Silverstein, ReNika Moore, Sandra Park, Zachary L. Heiden, Jocelyn D. Larkin, Lindsay Nako, Karen L. Loewy,* and *Raymond P. Tolentino*; for Public Citizen by *Scott L. Nelson* and *Allison M. Zieve*; and for Philip L. Schuler et al. by *Michael M. Epstein, pro se.*

Briefs of *amici curiae* were filed for the Commonwealth of Massachusetts et al. by *Andrea Joy Campbell,* Attorney General of Massachusetts,

Opinion of the Court

JUSTICE BARRETT delivered the opinion of the Court.

Deborah Laufer has sued hundreds of hotels whose websites failed to state whether they have rooms accessible to the disabled.   As the sheer number of lawsuits suggests, she does not focus her efforts on hotels where she has any thought of staying, much less booking a room.   Instead, Laufer systematically searches the web to find hotels that fail to provide accessibility information and sues to force compliance with the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. §12101 *et seq.*   Ordinarily, the hotels settle her claims and pay her attorney's fees.   But some have resisted, arguing that Laufer is not injured by the absence of information about rooms she has no plans to reserve.   Only plaintiffs who allege a concrete injury have standing to sue in federal court.   Laufer, these hotels have argued, is suing to enforce the law rather than to remedy her own harms.

Laufer has singlehandedly generated a circuit split.   The Second, Fifth, and Tenth Circuits have held that she lacks standing; the First, Fourth, and Eleventh Circuits have held that she has it.   We took this case from the First Circuit to resolve the split.   50 F. 4th 259 (2022); 598 U. S. —— (2023). Though Acheson Hotels, LLC, filed the petition, Laufer supported the grant.

After we granted review, the case took an unusual turn. In July, the United States District Court for the District of Maryland suspended Laufer's lawyer, Tristan Gillespie, from the practice of law for defrauding hotels by lying in fee peti-

———————

*David C. Kravitz*, Deputy State Solicitor, and *Ann E. Lynch* and *David R. Rangaviz*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *William Tong* of Connecticut, *Brian L. Schwalb* of the District of Columbia, *Kwame Raoul* of Illinois, *Anthony G. Brown* of Maryland, *Matthew J. Platkin* of New Jersey, *Letitia James* of New York, *Ellen F. Rosenblum* of Oregon, and *Robert W. Ferguson* of Washington; and for the National Association of Home Builders of the United States by *Jeffrey B. Augello*, *Thomas J. Ward*, and *Felicia K. Watson*.

tions and during settlement negotiations. See Order in *In re Gillespie*, No. 1:21–mc–14 (July 5, 2023), ECF Doc. 14. It based the suspension on a report finding that Gillespie demanded $10,000 in attorney's fees per case even though he used "boilerplate complaints." Report and Recommendation in No. 1:21–mc–14 (June 30, 2023), ECF Doc. 13, pp. 5, 26. In addition, Gillespie funneled six-figure sums to the father of Laufer's grandchild for investigatory work that he never performed, raising the prospect that either Gillespie or Laufer (or both) got a cut of the money. *Id.*, at 28, 30. Making matters still worse, the sanctions order against Gillespie also implicated Laufer's former counsel of record before this Court, Thomas Bacon. *Id.*, at 30–31.*

Following these revelations, Laufer voluntarily dismissed her pending suits with prejudice, including her complaint against Acheson in the District of Maine. See Notice of Voluntary Dismissal in No. 2:20–cv–00344 (July 20, 2023), ECF Doc. 45. She then filed a suggestion of mootness in this Court. At this point, Acheson had already filed its principal brief on the standing issue, and we deferred a decision on mootness until after oral argument.

Laufer does not argue that we *must* dismiss her suit for mootness. She acknowledges that we can address jurisdictional issues in any order we choose, see *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U. S. 422, 431 (2007), and so have authority to resolve the standing issue. But mootness is easy and standing is hard, Laufer says. She urges us to refrain from resolving a difficult question in a case that is otherwise over.

———

*On November 14th, the Fourth Circuit vacated and remanded the suspension order, holding that the District Court gave Gillespie insufficient notice that it might sanction him not only for dishonesty to opposing counsel, but also for failing to communicate with his clients. *In re Gillespie*, No. 23–1819 (2023) (*per curiam*). Disciplinary proceedings remain pending in the District Court.

Acheson, on the other hand, stresses that the difficult standing issue is the reason we took this case. Though Laufer's case is dead, the circuit split is very much alive. This Court has received briefs and heard oral argument. For efficiency's sake, Acheson insists that we should settle the issue now rather than repeating the work later. Moreover, Acheson warns that if we dismiss this case for mootness, the standing issue might not come back anytime soon. While Laufer has disavowed the intention to file any more ADA tester suits, Tr. of Oral Arg. 70, others will file in the circuits that sided with her, and hotels will settle, regarding it as pointless to challenge circuit precedent in this Court. Why would any hotel take a case this far, Acheson asks, if the respondent can evade our review by abandoning a claim rather than risking a loss?

We are sensitive to Acheson's concern about litigants manipulating the jurisdiction of this Court. We are not convinced, however, that Laufer abandoned her case in an effort to evade our review. She voluntarily dismissed her pending ADA cases after a lower court sanctioned her lawyer. She represented to this Court that she will not file any others. Laufer's case against Acheson is moot, and we dismiss it on that ground. We emphasize, however, that we might exercise our discretion differently in a future case.

\*　　\*　　\*

The judgment is vacated, and the case is remanded to the United States Court of Appeals for the First Circuit with instructions to dismiss the case as moot. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950). JUSTICE JACKSON objects to this disposition, urging us to instead leave the First Circuit's judgment in place. *Post*, at 16–20 (opinion concurring in judgment). Our *Munsingwear* practice is well settled. See, *e. g.*, *United States* v. *Microsoft Corp.*, 584 U. S. 236, 240 (2018) (*per curiam*); *Great Western Sugar Co.* v. *Nel-*

*son*, 442 U. S. 92, 93–94 (1979) (*per curiam*); *Duke Power Co.* v. *Greenwood County*, 299 U. S. 259, 267 (1936) (*per curiam*); see also S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice § 19.5 (11th ed. 2019). We decline JUSTICE JACKSON's invitation to reconsider it.

*It is so ordered.*

JUSTICE THOMAS, concurring in the judgment.

Deborah Laufer has filed hundreds of lawsuits against hotels she has no intention of visiting, claiming that their websites lack accessibility information mandated by a federal regulation. At both parties' request, this Court agreed to answer a question that has divided the Courts of Appeals: whether plaintiffs like Laufer have standing to bring these claims. The Court decides not to decide that question because, after briefing began, Laufer voluntarily dismissed her claim in the District Court. I would answer this important and recurring question, which, as all agree, we have the authority to do. And, I conclude that Laufer lacks standing.

I

Title III of the Americans with Disabilities Act of 1990 (ADA) prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation," such as a hotel. 42 U. S. C. §§ 12182(a), 12181(7)(A). Title III defines discrimination to include "a failure to make reasonable modifications" when "necessary to afford . . . services . . . or accommodations to individuals with disabilities." § 12182(b)(2)(A)(ii). To enforce the ADA's prohibition on discrimination, Title III creates a private cause of action that permits "any person who is being subjected to discrimination on the basis of disability" to sue for violations. § 12188(a)(1). Only injunctive relief and attorney's fees are available to private litigants. *Ibid.*; see also §§ 12205, 2000a–3(a). The Attorney General, how-

ever, may obtain damages or assess civil penalties. § 12188(b)(2).

The Department of Justice promulgated a regulation known as the Reservation Rule to aid in the implementation of the ADA's prohibition on discrimination. The rule requires hotels to "[i]dentify and describe accessible features . . . in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs." 28 CFR § 36.302(e)(1)(ii) (2022). The rule also applies to reservations made "through a third party." *Ibid.*

Laufer, who is wheelchair bound, is a self-described "tester" of compliance with the Reservation Rule. From her home in Florida, Laufer scours the internet for hotel websites that do not contain the required accessibility information. When she finds a deficient website, she sues the hotel. She often offers to settle immediately for $10,000 in attorney's fees and corrective action. See Report and Recommendation in *In re Gillespie*, No. 1:21–mc–14 (D Md., June 30, 2023), ECF Doc. 13, p. 5; No. 1:21–mc–14 (July 5, 2023), ECF Doc. 14, p. 1, vacated on other grounds by *In re Gillespie*, No. 23–1819 (CA4, Nov. 14, 2023) (*per curiam*). In the past five years, Laufer has filed over 600 lawsuits against hotels.

In this case, Laufer visited the website of a bed and breakfast located in Maine, the Coast Village Inn. She filed suit against the Coast Village Inn's owner, Acheson Hotels, for failing to provide sufficient accessibility information. She also contended that 13 third-party booking websites, such as Expedia, failed to provide accessibility information for the Coast Village Inn. Laufer initially alleged that she was planning to visit the Coast Village Inn as part of a cross-country trip from Florida to Maine to Colorado. But she later disclaimed any intent to travel to Maine (or the Coast Village Inn). 50 F. 4th 259, 267, n. 3 (CA1 2022); see also Brief for Appellant in No. 21–1410 (CA1), p. 4, n. 1.

The District Court concluded that Laufer lacked standing and dismissed her complaint. The First Circuit reversed, relying primarily on this Court's holding in *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363 (1982), that a tester had standing to sue under the Fair Housing Act. When Acheson Hotels petitioned for certiorari, Laufer agreed. She highlighted that the Circuits were split as to her standing and argued that "clarity from this Court is badly needed." Brief in Opposition 1. After we granted certiorari and set the case for argument, Laufer filed a notice in the District Court of her voluntary dismissal of her claim with prejudice. And, even though Acheson Hotels (and several *amici*) had already filed briefs, Laufer requested that we dismiss this case as moot. We denied her request at that time, but agreed to consider it at oral argument. The case has been fully briefed and the Court has heard argument on the merits. Today, however, the majority opts to resolve this case on mootness. We can—and should—address the question on which we granted certiorari.

II

I would not dismiss this case as moot. There is no question that we have authority to address Laufer's standing. Standing and mootness are both jurisdictional doctrines that flow from Article III. And, there is no mandatory "sequencing of jurisdictional issues." *Ruhrgas AG* v. *Marathon Oil Co.*, 526 U. S. 574, 584 (1999). Indeed, as the majority and Laufer herself acknowledge, we have the discretion to determine either "'threshold groun[d] for denying audience to a case on the merits.'" *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U. S. 422, 431 (2007) (quoting *Ruhrgas*, 526 U. S., at 585); *ante*, at 4; Suggestion of Mootness 9 ("[T]his Court has discretion to resolve either issue first").

We should address Laufer's standing, rather than resolve this case on mootness. As an analytical matter, whether Laufer had standing the day she filed her suit is logically

antecedent to whether her later actions mooted the case. More importantly, whether Laufer has standing to bring her Reservation Rule claims is a recurring question that only this Court can definitively resolve. As the majority explains, "Laufer has singlehandedly generated a circuit split" on her standing. *Ante*, at 3. And Laufer is far from the only Reservation Rule tester. See, *e.g.*, *Harty* v. *West Point Realty, Inc.*, 28 F. 4th 435 (CA2 2022); *Love* v. *Marriott Ownership Resorts, Inc.*, No. 20–cv–7523 (ND Cal., Mar. 29, 2021); *Sarwar* v. *Om Sai, LLC*, No. 2:20–cv–483 (D Me., May 18, 2021). Beyond answering this question for our colleagues on the Courts of Appeal and District Courts, we should answer it for Acheson Hotels, which has spent significant time and resources fully briefing a question that will now go unanswered.

What is more, the circumstances strongly suggest strategic behavior on Laufer's part. After this case was well underway in this Court, Laufer filed a notice with the District Court voluntarily dismissing her claim with prejudice, ostensibly because another court sanctioned one of her attorneys for misconduct related to some of Laufer's ADA cases. But the attorney in question had nothing to do with the case before us. Suggestion of Mootness 3 (acknowledging at-issue attorney "had no involvement in the present case before this Court"). Laufer's logic is thus that she dismissed her claim—and the Court should no longer address whether she had standing—because an attorney she hired in an entirely different case engaged in misconduct. An unrelated attorney's conduct does nothing to change the analysis required to determine a plaintiff's standing. Laufer admits as much, arguing only that the alleged misconduct "could distract from the merits of her ADA claims and everything she has sought to achieve for persons with disabilities like herself." *Id.*, at 4. I would not reward Laufer's transparent tactic for evading our review. Although the majority leaves the door open to "exercise [its] discretion differently in a

future case," we have needlessly invited litigants to follow Laufer's path to manipulate our docket. *Ante*, at 5. We should not resolve this case about standing based upon mootness of Laufer's own making.[1]

## III

Turning to the question presented, Laufer lacks standing to bring her ADA claims. Article III of the Constitution extends the "judicial Power" to all "Cases" and "Controversies." Standing doctrine serves to "limi[t] the 'judicial power' to '"cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."'" *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 343 (2016) (Thomas, J., concurring) (quoting *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 774 (2000)). In doing so, standing "preserve[s] separation of powers by preventing the Judiciary's entanglement in disputes that are primarily political in nature." *Spokeo*, 578 U. S., at 344.

As I have previously explained, "[t]he mere filing of a complaint in federal court . . . does not a case (or controversy) make." *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 446 (2021) (Thomas, J., dissenting). Our "judicial power [does not extend] to every violation of the constitution [or law] which may possibly take place, but to 'a case in law or equity,' in which a right, under such law, is asserted in a Court of justice." *Cohens* v. *Virginia*, 6 Wheat. 264, 405 (1821). To have standing, a plaintiff must assert a violation of his rights. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 563 (1992) ("[T]he party seeking review [must] be himself among the injured" (internal quotation marks omitted)). After all, "[t]he province of the court is, solely, to decide on the rights of individuals." *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803). It is not to address a plaintiff's claim of

---

[1] The majority vacates the opinion below in Laufer's favor, and rightly so. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950).

"only harm to his and every citizen's interest in proper application of the . . . laws." *Lujan*, 504 U. S., at 573.[2]

Laufer lacks standing because her claim does not assert a violation of a right under the ADA, much less a violation of her rights. Her claim alleges that Acheson Hotels violated the ADA by failing to include on its website the accessibility information that the Reservation Rule requires. Yet, the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the . . . services . . . of any place of public accommodation." 42 U. S. C. § 12182(a). In other words, the ADA prohibits only discrimination based on disability—it does not create a right to information.

Laufer's ADA claim is thus different from the tester's claim under the Fair Housing Act that the Court addressed

---

[2] The traditional distinction between public and private rights shapes the contours of the judicial power. See *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 344 (2016) (opinion of THOMAS, J.); *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. 665, 713 (2015) (THOMAS, J., dissenting). Private rights, such as the classic rights to life, liberty, and property, were "so called because they 'appertain[ed] and belong[ed] to particular men . . . merely as individuals,' not 'to them as members of society [or] standing in various relations to each other'—that is, not dependent upon the will of the government." *Id.*, at 713 (quoting 1 W. Blackstone, Commentaries on the Laws of England 119 (1765)). By contrast, public rights "belon[g] to the public as a whole." *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 171 (2015) (THOMAS, J., dissenting); see also 4 Blackstone, Commentaries 5 (1772). And "quasi-private rights, or statutory entitlements, are those '"privileges"' or '"franchises"' that are bestowed by the government on individuals." *B&B Hardware*, 575 U. S., at 171. We need not classify Laufer's legal interests because, regardless of which type of right a plaintiff asserts, he must allege "the violation of *his* private legal right" or *his* own injury based on a violation of a public right. *Spokeo*, 578 U. S., at 344 (opinion of THOMAS, J.) (emphasis added); see also A. Woolhandler & C. Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 723 (2004); C. Nelson, Vested Rights, "Franchises," and the Separation of Powers, 169 U. Pa. L. Rev. 1429, 1433, 1437–1438 (2021). For the reasons provided, Laufer has not alleged a violation of her rights or a cognizable injury to herself.

in *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363.   In contrast to the ADA, the Fair Housing Act explicitly prohibits "represent[ing] to any person because of race . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." §3604(d).   Accordingly, when Havens Realty told a black tester that no apartments were available but told a white tester that it had vacancies, the Court found that the black tester had standing to sue.   The Court explained that the statute created "a legal right to truthful information about available housing." *Id.*, at 373.   The black tester had been personally denied that truthful information, so she had standing to bring her claim.   *Havens Realty* thus has no bearing on Laufer's standing as a tester of compliance with the ADA, which provides no such statutory right to information.

Laufer points to the Reservation Rule, alleging that it creates an entitlement to accessibility information.   But even assuming a regulation could—and did—create such a right, Laufer asserts no violation of her own rights with regard to that information.   Laufer does not even harbor "'some day' intentions" of traveling to Maine to visit the Coast Village Inn.   *Lujan*, 504 U. S., at 564.   Her lack of intent to visit the hotel or even book a hotel room elsewhere in Maine eviscerates any connection to her purported legal interest in the accessibility information required by the Reservation Rule. To put it in the "more pedestrian terms" used by then-Judge Scalia, standing asks "'What's it to you?'"   The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983).   Acheson Hotels' failure to provide accessibility information on its website is nothing to Laufer, because she disclaimed any intent to visit the hotel.

Rather than assert a violation of her own rights, Laufer casts herself in the role of a private attorney general, surfing the web to ensure hotels' compliance with the Reservation Rule.   Laufer has described herself as "an advocate on be-

THOMAS, J., concurring in judgment

half of both [her]self and other similarly situated disabled persons." App. 17a. She admits that, "[a]s a tester, [she] visit[s] hotel online reservation services to ascertain whether they are in compliance with the Americans with Disabilities Act." *Ibid.* As a public official would do, Laufer even monitors those hotel websites she has found lacking. She uses "a system" to track each of the hundreds of hotels she has sued. *Id.*, at 19a. "Once a case is settled, [she] mark[s] the date . . . when the defendant has agreed to fix its websites," and on that date, she "revisit[s]" the website to ensure the hotel has complied. *Id.*, at 19a–20a.

Laufer sues "not to enforce specific legal obligations whose violation works a direct harm" on her, but to force hotels to comply with the Reservation Rule. *Allen* v. *Wright*, 468 U. S. 737, 761 (1984). "Vindicating the *public* interest . . . is the function of Congress and the Chief Executive," however, not private plaintiffs. *Lujan*, 504 U. S., at 576. The President is tasked with the duty to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, §3, and Executive Branch officials have discretion to choose whether and how to enforce the law, see *Heckler* v. *Chaney*, 470 U. S. 821, 831–832 (1985). Yet, as Judge Newsom has explained, "[t]esters exercise the sort of proactive enforcement discretion properly reserved to the Executive Branch," with none of the corresponding accountability. *Laufer* v. *Arpan, LLC*, 29 F. 4th 1268, 1291 (CA11 2022) (concurring opinion).

This case exemplifies the dangers. An official could have informed Acheson Hotels that its website failed to comply with the Reservation Rule, and Acheson Hotels could have updated its website to explain it had no accessible rooms. Laufer, however, chose to "enforce" each technical violation of the ADA she could uncover with a lawsuit. Because she is a private plaintiff, no discretion was required or exercised. And, of course, Laufer has been willing to forgo her suits if a hotel pays up, even though the ADA provides for no damages for private litigants. Laufer's aggressive efforts to

personally impose financial penalties for violations of the Reservation Rule go far beyond the role that Congress envisioned for private plaintiffs under the ADA. Without a violation of her own rights, Laufer lacks standing to sue hotels under the ADA. Ensuring and monitoring compliance with the law is a function of a Government official, not a private person who does not assert a violation of her own rights.

## IV

Standing ensures that courts decide disputes over violations of a person's rights, not a defendant's compliance with the law in the abstract. Because Laufer has not asserted a violation of a right owed to her, she has no standing to bring her Reservation Rule claims. The Court should not have avoided reaching that conclusion due to Laufer's eleventh-hour tactics. I respectfully concur in the judgment because I would vacate and remand, with instructions to dismiss for lack of standing.

JUSTICE JACKSON, concurring in the judgment.

I agree with the Court that this case is moot and that it should be resolved on that basis. But the Court goes further, ordering vacatur of the judgment of the Court of Appeals under *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950). See *ante*, at 5–6. In my view, when mootness ends an appeal, the question of what to do with the lower court's judgment, if anything, raises a separate issue that must be addressed separately.

## I

Mootness and vacatur are distinct concepts. Start with mootness. The doctrine of mootness stems from Article III of the Constitution, which permits federal courts to adjudicate only "Cases" and "Controversies." "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell* v. *McCormack*, 395 U. S. 486, 496 (1969). If a case

becomes moot, "the existence of a case or controversy" is at
an end, and there is therefore no basis for "the exercise of
judicial power." *Liner* v. *Jafco, Inc.*, 375 U. S. 301, 306, n. 3
(1964); see also *Chapman* v. *Doe*, 598 U. S. ___, ___ (2023)
(JACKSON, J., dissenting). Mootness thus justifies only dis-
missal. Barring some other justification, we can go no
further.

Vacatur is a different animal entirely. Vacatur is a rem-
edy that erases a judgment that has already been rendered.
Here, the Court invokes a so-called *Munsingwear* vacatur,
see *ante*, at 5–6, a species of vacatur that we have sometimes
applied to judgments in civil cases that have "become moot
while on [their] way here or pending our decision on the mer-
its," 340 U. S., at 39.

The precise origins of vacatur, both as a general matter
and in its *Munsingwear* form, are uncertain. In fact, some
have described the power of a court to vacate a judgment as
"shrouded in ancient lore and mystery." Advisory Commit-
tee's Note on Fed. Rule Civ. Proc. 60(b), 28 U. S. C. App.,
p. 289.[1] It seems plausible that our authority to vacate a
lower court's judgment under *Munsingwear* arises from our
"supervisory appellate power" to "make such disposition of
the case as justice requires." *Walling* v. *James V. Reuter,
Inc.*, 321 U. S. 671, 676 (1944); see also *U. S. Bancorp Mort-
gage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18, 21–22
(1994). All agree, however, that vacatur extends from the
historical practice of equity, which for centuries has provided
courts with the power "to protect all rights and do justice to
all concerned." *Rubber Co.* v. *Goodyear*, 9 Wall. 805, 807

---

[1] We have sometimes invoked 28 U. S. C. §2106 as the source of our vaca-
tur authority after mootness arises, see, *e. g.*, *Camreta* v. *Greene*, 563 U. S.
692, 712 (2011), but that statute provides only that we may "direct the
entry of such appropriate judgment, decree, or order, or require such fur-
ther proceedings to be had as may be just under the circumstances."
§2106. And, of course, that statutory provision cannot confer jurisdiction
in excess of Article III, from which the limitation of mootness derives.

(1870). The *Munsingwear* remedy, like its vacatur kin, developed from "this equitable tradition." *Bancorp*, 513 U. S., at 25.

As an equitable remedy, vacatur "is not granted as a matter of course." *Salazar* v. *Buono*, 559 U. S. 700, 714 (2010) (opinion of Kennedy, J.). Instead, precisely "[b]ecause [vacatur] is rooted in equity, the decision whether to vacate turns on 'the conditions and circumstances of the particular case.'" *Azar* v. *Garza*, 584 U. S. 726, 729 (2018) (*per curiam*) (quoting *United States* v. *Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft*, 239 U. S. 466, 478 (1916)). Per historical tradition, a court that is asked to exercise its equitable authority to vacate a lower court's judgment must determine, in essence, whether it is "most consonant to justice" for the judgment to "remain undisturbed" or be vacated. *South Spring Hill Gold Mining Co.* v. *Amador Medean Gold Mining Co.*, 145 U. S. 300, 301–302 (1892) (emphasis deleted).

II

Because mootness and vacatur involve different legal analyses, see Part I, *supra*, I think courts should address them separately. Moreover, at least in theory if not in practice, vacatur does not—and cannot—automatically follow from mootness.

For one thing, automatic vacatur plainly flouts the requirement of an individualized, circumstance-driven fairness evaluation, which, as I have explained, is the hallmark of an equitable remedy. "The essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case." *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944). Vacatur is an "extraordinary" exercise of an appellate court's "equitable" authority. *Bancorp*, 513 U. S., at 26. As such, it simply cannot be a one-size-fits-all solution.

Second, and perhaps even more fundamentally, automatic vacatur is flatly inconsistent with our common-law tradition

of case-by-case adjudication, which "assumes that judicial decisions are valuable and should not be cast aside lightly." *Chapman*, 598 U. S., at ——.   Our legal system rests not only on the holdings of this Court, but also on the reasoned decisions of duly authorized lower court judges.   Jurists presiding over cases at every level have a duty "to say what the law is."   *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803).   That mootness can sometimes leave parties unable to appeal does not bear on the continued validity of those lower court opinions in any respect.

We do not consider a court's judgment to be any less binding on the parties simply because there is not an appeal; appeal or not, lower court rulings are still law.   And it is not as if a decision rendered by a lower court is less than final, or is not perfected, unless and until it receives the *imprimatur* of this Court.   Indeed, many lower court determinations are not even appealable as a matter of law.   See, *e. g.*, 28 U. S. C. § 1447(d) (providing that, with limited exceptions, "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise"); cf. § 1292(a) (authorizing appeals of only certain kinds of interlocutory orders).   Our legal system regards those decisions as pronouncements of law nevertheless.

In other words, even if a party cannot appeal, or opts not to do so, lower court judgments are binding and presumptively valid.   And the lack of an appeal, on its own, does not suffice to rebut that presumption.   Any suggestion to the contrary misunderstands the scope of the authority that all federal judges have pursuant to Article III, and disrespects the time and talent of the jurists who have previously undertaken to assess the merits of the matter.

Nor is the validity of a lower court's judgment cast into doubt as a result of the case's subsequent mootness.   We do not erase past precedents just because those cases cease to be live, litigated matters.   Every federal case fades to black at some point, yet in our common-law system of case-by-case

adjudication, the rulings that Article III judges have issued in those cases remain good law. "[T]here is no particular reason to assume that a decision, later mooted, is any less valid as precedent than any other opinion of a court." *Mahoney* v. *Babbitt*, 113 F. 3d 219, 222 (CADC 1997).

## III

### A

Why, then, does the possibility of nullifying a lower court's judgment by ordering *Munsingwear* vacatur exist? I submit that it serves a specific, equitable function: to address any unjust circumstances or unfairness that might stem from the inability to appeal a particular lower court decision, notwithstanding its presumptive validity. And just as in *Munsingwear* itself, "the party seeking relief from the status quo of the appellate judgment" bears the burden of establishing "equitable entitlement to [this] extraordinary remedy." *Bancorp,* 513 U. S., at 26.[2]

Thus, in my view, sound vacatur arguments must be rooted in fairness. Likewise, I believe that a court's *Munsingwear* determination should involve a particularized assessment of whether "the conditions and circumstances of the particular case" *warrant* vacatur of the lower court's judgment. *Garza*, 584 U. S., at 729 (internal quotation marks omitted).

---

[2] In *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950), the Federal Government, as plaintiff, had brought both an injunctive claim and a damages claim; it lost the injunctive claim first and was unable to appeal that lower court determination because of intervening mootness. *Id.*, at 37. The unappealable lower court judgment with respect to the injunctive claim then precluded the Government from litigating the merits of its damages claim. *Ibid.* This Court noted that a vacatur request had been available to the Government to avert this unfairness, but that the Government had "slept on its rights" in failing to seek that particular remedy. *Id.*, at 40–41.

It is, of course, impossible to catalog all of the potential circumstances that might justify vacatur of a lower court's judgment on fairness grounds, so I will not attempt to do so here. As a general matter, I believe that a party who claims equitable entitlement to vacatur must explain what harm—other than having to accept the law as the lower court stated it—flows from the inability to appeal the lower court decision. The procedural history of *Munsingwear* provides one example of the kind of harm that might warrant vacatur. See n. 2, *supra*. Another stems from the fact that courts "must also take account of the public interest" when making a vacatur determination, *Bancorp*, 513 U. S., at 26, which raises broader fairness concerns—such as "the orderly operation of the federal judicial system," *id.*, at 27. For that reason, I think that the Court's "sensitiv[ity] to Acheson's concern about litigants manipulating the jurisdiction of this Court," *ante*, at 5, could be a relevant vacatur consideration, and is likewise reflected in our prior observation that it would be "strange" to "permit a plaintiff to obtain a favorable judgment, take voluntary action that moots the dispute, and then retain the benefit of the judgment." *Garza*, 584 U. S., at 729 (internal quotation marks omitted).[3]

It suffices for now to say that "[f]lexibility rather than rigidity has distinguished" a court's equitable power and the potential reasons for exercising it. *Hecht*, 321 U. S., at 329. Still, it bears repeating that the reason for a vacatur remedy must be more than "mere disagreement with the decision that one seeks to have vacated." *Chapman*, 598 U. S., at ——.

———

[3] The Court has accepted respondent's claim that she voluntarily dismissed her suit for legitimate reasons, see *ante*, at 5, and to be clear, I concur with that conclusion. My only point is that any perception that mootness has been procured tactically, based on its timing (here, the mootness occurred after we granted review, oral argument was scheduled, and briefing had begun) or otherwise, would be relevant to determining whether the equitable vacatur remedy is warranted.

Every lower court loser would, of course, prefer that the lower court's opinion not exist. But in each and every case in our adversarial justice system, one side loses—and generally must accept that outcome.

To me, such first principles about the nature of the vacatur remedy, the design of our common-law system, and the scope of appellate authority best inform how this Court, and other Courts of Appeals, should proceed when addressing a *Munsingwear* motion. Mindful that vacatur of a lower court's judgment is an extraordinary equitable remedy designed to ensure fairness, and fully cognizant of the danger of uprooting presumptively valid legal precedents—contributions to the common law that belong to all who are governed by the rule of law in our constitutional system, not just the parties in the particular case—we should carefully evaluate the purported need for vacatur, *in terms of the harms it would avert*. And in the absence of any demonstrated harm-related justification for vacating a lower court's opinion, we should conclude that "[t]he 'public interest' . . . is generally better served by leaving appellate judgments intact." *Alvarez* v. *Smith*, 558 U. S. 87, 98 (2009) (Stevens, J., concurring in part and dissenting in part).

B

All that said, I am aware that a party who is deprived of the opportunity to appeal due to mootness (like Acheson) might feel that loss acutely. It might even experience the thwarting of its chance to obtain a reversal on appeal as a grave injustice, on par with any other fairness-based justification for vacatur of the lower court's ruling. I also recognize that this Court has previously expressed sympathy for that view. See, *e.g.*, *Camreta* v. *Greene*, 563 U. S. 692, 713 (2011) (suggesting that the inability to challenge "a legally consequential decision" warrants vacatur). But I disagree. There is nothing inherently inequitable about not being able to pursue an appeal.

JACKSON, J., concurring in judgment

　　To reiterate the basic bottom line: The lack of jurisdiction that prevents an appeal and the set of circumstances that relate to whether the lower court's judgment should be permitted to stand are entirely distinct. The lower court issued its ruling while the case was alive. And so rendered, that ruling is precedent—"presumptively correct and valuable to the legal community as a whole." *Bancorp*, 513 U. S., at 26. The observation that "what is done is done" is thus the starting point for assessing any response to mootness beyond mere dismissal of the appeal.

　　It is true that the losing party would ordinarily have the right to challenge a lower court's decision by pursuing an appeal. But that right is not absolute or inviolate. Wanted appeals sometimes cannot proceed for a host of reasons,[4] and in such instances, the losing party is normally stuck with the outcome that the lower court announced after its consideration of the matter in dispute. We do not consider the proposers of unrequited requests for appellate review to have been unjustly wronged.

　　To be sure, in the instant case, there is another wrinkle: We not only granted Acheson's petition for certiorari, but we also heard oral argument related to the merits of its claim that the lower court's judgment was erroneous. Thus, Acheson had a better opportunity than most to achieve the requested reversal of the Court of Appeals' unfavorable decision. But this Court's demonstrated interest in reviewing Acheson's challenge to respondent's moot legal action does not add anything to the fairness equation. Now that its appeal has been mooted, Acheson is in no different position than the multitude of other litigants who suffered defeat in the Courts of Appeals and will not get a review of their case on the merits from this Court. To sustain a request for va-

――――――

　　[4] Our Court might decide not to grant a would-be petitioner's request for certiorari, for example. Or, even after granting review, we might dismiss the petition after determining that certiorari was improvidently granted.

catur, Acheson needs to rely on something more than its own abject disappointment.

\*     \*     \*

The parties in this case have not provided any equitable basis for vacatur of the Court of Appeals' judgment, nor has the majority described any, beyond its reference to the Court's past practices and a citation to *Munsingwear*.   See *ante*, at 5–6.   For the reasons explained above, I would ordinarily not agree to the imposition of a vacatur remedy that was not fully discussed, much less established.   But I recognize that this Court's vacatur ruling is consistent with our "established practice" of vacating the judgment of the Court of Appeals below "when mootness occurs through . . . the unilateral action of the party who prevailed in the lower court." *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 70–71 (1997) (internal quotation marks omitted); see also *Garza*, 584 U. S., at 729; *supra*, at 19, and n. 3.   I concur in the judgment on the basis of that precedent, despite my own views of this practice, because respondent's voluntary dismissal is the sort of "unilateral action" that we have previously deemed adequate for vacatur.

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 4, n., line 5: "*(per curiam)*" is inserted after "(2023)"
p. 5, line 4 from bottom: "*Post*, at 16–20 (opinion concurring in judgment)" is inserted after "place"
p. 10, line 10 from bottom: "in" is deleted
p. 16, line 5: "(opinion of Kennedy, J.)" is inserted after "(2010)"
p. 19, line 16: "manipulating this Court's jurisdiction" is replaced with "manipulating the jurisdiction of this Court"