In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2071

MICHAEL WOOD,

*Plaintiff-Appellant,*

*v.*

SECURITY CREDIT SERVICES, LLC, doing business as
EQUIPRO INVESTMENTS,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-02369 — **Sara L. Ellis**, *Judge.*

———————————

SUBMITTED APRIL 4, 2024 — DECIDED JANUARY 28, 2025

———————————

Before EASTERBROOK, HAMILTON, and KOLAR, *Circuit
Judges.*

KOLAR, *Circuit Judge.* In 2017, Pentagon Federal Credit Union (PenFed) sent Michael Wood a letter saying that he was delinquent on his credit card payments. Wood disputed the debt in writing, and PenFed responded with another letter that said it had determined the debt was valid. In 2018, debt collector Security Credit Services, LLC (SCS) purchased a

bundle of debts, including Wood's, from PenFed. SCS reported the debt as delinquent to a credit reporting agency without mention of Wood's dispute.

In this litigation, Wood alleges that SCS violated the Fair Debt Collection Practices Act (FDCPA) by communicating information about his debt to a third-party without noting that he disputed the debt. The district court granted summary judgment for SCS. We reverse and remand.

## I. Background

Michael Wood incurred credit card debt with PenFed. He eventually defaulted on the debt, and PenFed reported Wood's debt to national credit reporting agencies, including Equifax. Wood, however, disagreed with the information reported by PenFed on his Equifax credit report. On April 26, 2017, Wood's attorney sent PenFed a letter disputing the debt as too high. The letter stated that "this Notice has the same effect as a dispute to the validity of the alleged debt" and that it did not constitute "a refusal to pay, but a notice sent pursuant to the Fair Credit Reporting Act."

After investigating Wood's dispute, PenFed concluded that the debt was accurately reported. On May 16, 2017, PenFed sent a response letter saying that "[a] review of our records for the account listed above indicates that the delinquency in question is valid and will not be removed" from Wood's credit report. The letter advised Wood or his counsel to contact PenFed "to set up a satisfactory repayment plan." Neither Wood nor his attorney replied. According to Wood, despite his lack of response, he continued to believe the debt was inaccurate.

When reporting debt information to national credit reporting agencies, as required by the Fair Credit Reporting Act (FCRA), PenFed uses the "Metro-2 Format." After PenFed determined that Wood's debt was valid, and because it did not receive a response from Wood, PenFed reported an "XH" Metro-2 code for Wood's debt. This code is used for accounts previously disputed but then resolved by an investigation. Other codes include the "XB" code, which is used for accounts where the consumer disputes the debt but an investigation is pending, and the "XC" code, which reflects that a creditor completed its investigation of a dispute but the consumer disagrees with the result.

In July 2018, PenFed sold a bundle of accounts that included Wood's account to SCS, a debt collector subject to the FDCPA. In the Purchase Agreement, PenFed made representations and warranties that PenFed used commercially reasonable efforts to remove from the pool any accounts with "unresolved disputes," that every account purchased had been maintained and serviced in full compliance with the FCRA, and that PenFed had not omitted any known material information relating to the accounts that would adversely affect SCS's ability to seek recovery.

The meaning of "unresolved disputes" is critical to this appeal. Wood has established that there is a genuine issue of material fact as to whether SCS understood the term "unresolved disputes" to mean disputes that were not resolved to the satisfaction of both PenFed and the accountholder. In PenFed's view, if a consumer voiced disagreement with PenFed's response to a dispute, that would qualify as an unresolved dispute. If a consumer was silent after PenFed's response, PenFed interpreted the silence as agreement that

resolved the dispute. It is unclear if SCS agreed with PenFed's view: testimony from its corporate representative indicates that it did, while internal documents evince that it did not.

In connection with the sale, PenFed transmitted an electronic sale file to SCS, which contained account-level information for Wood's debt. It did not include any indication that the debt was previously disputed. PenFed did not provide SCS with a copy of Wood's letter to PenFed disputing the debt, PenFed's response letter, or any indication that the debt was ever disputed.

In September 2018, SCS reported Wood's account to credit reporting agencies but did not indicate that Wood disputed the debt. SCS relied on PenFed's contractual representations and warranties and did not independently investigate the history of the debt. In addition, SCS had not received any communication from Wood disputing the debt. If Wood had contacted SCS, SCS maintains that it would have "timely notified the national credit reporting agencies of [Wood's] dispute, consistent with its policies and procedures." Indeed, in May 2020, after this litigation began, SCS informed the credit reporting agencies that Wood's debt was disputed.

Wood filed a complaint on April 16, 2020 alleging that SCS violated §1692e(8) of the FDCPA when it reported his debt without communicating that the debt was disputed. Wood later filed an amended complaint that added facts about his standing to sue and the terms and conditions of the sale of his account to SCS. Wood then amended his complaint a second time to include a class claim, but he never pursued class certification.

The parties filed cross-motions for summary judgment. SCS argued that the district court should grant judgment in its favor because (1) SCS had no reason to know Wood's account was disputed; (2) regardless, the bona fide error defense precluded liability; and (3) Wood lacked Article III standing to pursue the alleged FDCPA violation in federal court. In his motion for summary judgment, Wood argued that the prerequisites of a §1692e(8) violation were met because SCS failed to communicate to credit reporting agencies that Wood had disputed his debt when SCS knew or should have known about his dispute.

The district court granted SCS's motion for summary judgment and denied Wood's cross-motion. The district court determined that Wood had standing because SCS's dissemination of his credit information to a third party without noting the debt was disputed was a concrete injury in fact. On the merits, the court concluded that PenFed reasonably interpreted Wood's lack of response to PenFed's letter to mean that he no longer disputed the debt. By extension, Wood therefore could not establish that SCS knew or should have known that he still disputed the debt. Wood now appeals.

## II. Analysis

We review a district court's decision on cross-motions for summary judgment de novo, and construe all reasonable inferences in the light most favorable to the losing party—here, Wood. *Holcomb v. Freedman Anselmo Lindberg, LLC*, 900 F.3d 990, 992 (7th Cir. 2018). We can affirm on any ground that is supported in the record and adequately presented in the trial court. *Ross v. Fin. Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 433 (7th Cir. 2023) (citing *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 359 (7th Cir. 2019)). Summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. WOOD HAS STANDING

To begin, we turn to standing. Article III of the Constitution limits federal judicial power to "Cases" and "Controversies." U.S. CONST. art. III, §2. A necessary component of the case-or-controversy limitation is that a plaintiff must have standing to sue—that is, a "personal stake" in the outcome of the lawsuit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

A plaintiff seeking to establish Article III standing must show: (1) a concrete and particularized injury in fact, (2) that the injury is traceable to the defendant's conduct; and (3) that the injury is redressable by judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Without "an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). The party seeking to invoke federal jurisdiction bears the burden of establishing standing to sue. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) (citing *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018)). Standing is established "with the manner and degree of evidence required at the successive stages of the litigation," so a plaintiff at summary judgment must show standing with evidence in the record. *Lujan*, 504 U.S. at 561.

Here, we address whether Wood's injury was concrete under the first element. To qualify as concrete, an injury must have "a 'close relationship' to a harm 'traditionally'

recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). That covers tangible harms, like physical and monetary harms. *Id.* at 425. It also includes intangible harms, such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* When Congress creates a new statutory cause of action, it can "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan*, 504 U.S. at 578. But it may not "enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 426 (internal quotations omitted).

With the passage of the FDCPA, Congress created a cause of action to alleviate "abusive, deceptive, and unfair debt collection practices." 15 U.S.C. §1692(a). Of course, a "violation of an FDCPA provision, whether 'procedural' or 'substantive,' does not necessarily cause an injury in fact." *Markakos v. Medicredit, Inc.*, 997 F.3d 778, 780 (7th Cir. 2021) (citing *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066 (7th Cir. 2020)). Thus, Wood must show that his specific FDCPA injury has a "close historical or common-law analogue," although it need not be an "exact duplicate." *TransUnion*, 594 U.S. at 424.

According to Wood, SCS violated §1692e(8) of the FDCPA when it reported his debt to credit reporting agencies without noting his dispute. Section 1692e(8) prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. §1692e(8). This is the same kind of FDCPA violation we encountered in *Ewing v. MED-1 Sols.*,

*LLC*, 24 F.4th 1146 (7th Cir. 2022). There, we concluded that the plaintiffs had standing because "the harm Congress sought to remedy through §1692e(8) is analogous to the harm caused by defamation, which has long common law roots." *Id.* at 1153. But because a plaintiff cannot state a defamation claim unless she shows that the alleged defamatory statement was published, an FDCPA plaintiff seeking to use defamation as a common law analogue must also show publication, or else the harm suffered would not resemble defamation much at all. *Id.*; *see also Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735–36 (7th Cir. 2023) (holding that the plaintiff could not analogize her FDCPA claim to the common law tort of "publicity given to another person's private life" because her alleged injury did not "remotely" resemble the elements of that tort). Mere dissemination to a third-party is insufficient to show publication: in addition, "the third party must understand the defamatory nature of the communication." *Ewing*, 24 F.4th at 1154.

In our recent opinion in *Freeman v. Ocwen Loan Servicing, LLC*, we held that an FDCPA plaintiff who alleged that a debt collector wrongly reported her to be in default on a loan lacked standing because she had not provided "specific facts" that the debt collector "disseminated the inaccurate reporting to a third party, such as [the credit reporting agency], who understood the defamatory significance of the inaccurate reporting." 113 F.4th 701, 710 (7th Cir. 2024). We do not take *Freeman* to set a difficult burden for establishing that a credit reporting agency would understand the defamatory significance of inaccurate reporting. *See Ewing*, 24 F.4th at 1154 ("[B]eing portrayed as a deadbeat who does not pay her debts has real-world consequences."). Rather, this court concluded that the plaintiff presented "no evidence" that the credit

reporting agency who received the inaccurate report understood the defamatory significance of the communication.[1] *Freeman*, 113 F.4th at 709–10.

This case has such evidence. Credit reporting agency Equifax included Wood's debt on his credit reports, and when SCS ultimately reported a dispute, Equifax included that too. *Ewing*, 24 F.4th at 1154 ("TransUnion included the debts in the Consumers' credit reports; TransUnion would have included the disputes too had the Debt Collectors communicated them."). And the record shows that a debt marked as disputed negatively impacts a credit score less than a debt that is not marked as disputed. As *Ewing* put it, "[t]hat is enough" to establish that Equifax understood the defamatory significance of SCS's reporting. *Id.* As we have said, "the failure to inform a credit reporting agency that the debtor disputed his or her debt will *always* have influence on the debtor, as this information will be used to determine the debtor's credit score." *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 349 (7th Cir. 2018) (emphasis in original).[2]

Still, SCS argues that only a failure to report a meritorious dispute is sufficiently analogous to defamatory harm, and

---

[1] As a factual distinction, unlike *Ewing* and this case, the FDCPA claim in *Freeman* was not about the failure to communicate that a debt was disputed.

[2] We have recognized that "*TransUnion* … supersedes *Evans* to the extent *Evans* says that a mere risk of harm is a sufficiently concrete injury to support a suit for damages." *Ewing*, 24 F.4th at 1152. We also said that "[n]evertheless, the outcome of *Evans* would be the same under [*Ewing*] for the injury the plaintiffs in *Evans* suffered is indistinguishable from the injury the Consumers suffered." *Id.* at 1152 n.2. The issue on which *TransUnion* superseded *Evans* is not present in this appeal.

that Wood has not shown his purported debt is inaccurate. We reject this argument. In *Evans*, 889 F.3d at 346–47, we declined to rewrite §1692e(8) by introducing a requirement that a consumer's dispute be "valid or reasonable." *Id*. After all, "our task is to interpret the words of Congress, not add to them." *Id*. at 346 (internal quotations omitted). And while *Evans* predated *TransUnion*, that later decision rejected the argument that the plaintiffs did not suffer a harm with a "close relationship" to defamation even though the information disseminated was not "literally false." *TransUnion*, 594 U.S. at 433. Under §1692e(8), the false information is simply that the debt was undisputed, not the merits of the dispute. *Ewing*, 24 F.4th at 1152; *see also DeKoven v. Plaza Assocs*., 599 F.3d 578, 582 (7th Cir. 2010) ("[A] consumer can dispute a debt for 'no reason at all.'"). As the Supreme Court has cautioned, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425. We thus conclude that Wood has shown an "intangible, reputational injury that is sufficiently concrete for purposes of Article III standing." *Ewing,* 24 F.4th at 1154.

### B.  A GENUINE ISSUE OF MATERIAL FACT PRECLUDES SUMMARY JUDGMENT

SCS violated the FDCPA if it knew or should have known that Wood disputed his debt. Because there is a genuine issue of material fact—SCS's understanding of what makes an account "disputed"—it was premature for the district court to enter summary judgment for SCS.

To prevail, Wood must prove that (1) SCS qualifies as a "debt collector," that (2) SCS took the actions Wood complains of "in connection with the collection of any debt," and that (3) those actions violated one of the FDCPA's substantive provisions. *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384, 387 (7th Cir. 2010). SCS does not contest that the first and second elements are satisfied, so we focus on the third. As discussed above, the relevant substantive provision is §1692e(8), which prohibits communicating credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is indeed disputed. 15 U.S.C. §1692e(8).

Even when a debt collector violates the FDCPA, it is entitled to invoke the affirmative defense of bona fide error. 15 U.S.C. §1692k(c). The bona fide error defense requires a debt collector to show that (1) the violation was not intentional, (2) the violation resulted from a bona fide error, and (3) the debt collector maintained procedures reasonably adapted to avoid any such error. *Ross*, 74 F.4th at 433–34 (citing *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005)). Crucially, "a defendant can invoke the bona fide error defense only if it claims it made an error of *fact*, not an error of *law*." *Evans*, 889 F.3d at 349 (emphasis in original). In other words, "the bona fide error defense in §1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute." *Id*. at 349–50 (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 604–05 (2010)).

With that preface, we can move on to Wood's affirmative case, focusing on whether SCS knew or should have known about his dispute. As an initial matter, we disagree with the

district court's conclusion that Wood's claim fails because his silence after PenFed's letter was an indication that he no longer disputed the debt. PenFed's letter did not advise Wood to voice any further dispute, and only asked him to contact PenFed to set up a payment plan. SCS has not presented evidence of industry practice or legal authority indicating that silence in response to a similar letter should be treated as agreement with a lender's investigation regarding the validity of the debt. That's unsurprising when one considers what this case is about.

Recall that Wood brings an FDCPA claim, and that as the original creditor, PenFed did not have FDCPA obligations. *See Carter v. AMC, LLC*, 645 F.3d 840, 843 (7th Cir. 2011) (observing that the FDCPA "excludes" original creditors). Instead, PenFed was required to communicate a consumer's dispute under the FCRA. *See* 5 U.S.C. §1681s-2(a)(3). We have said that "the FDCPA does not incorporate §1681s-2 [of the FCRA] or say that its requirements apply to §1692e(8)" and we emphasized that a consumer who wishes to raise a dispute faces more rigorous standards under the FCRA than under the FDCPA. *Evans*, 889 F.3d at 348. The parties have not briefed the relationship between §1681s-2(a)(3) and §1692e(8), and we cannot say that the question of whether the FCRA obliged PenFed to report Wood's debt as disputed necessarily has the same answer as whether the FDCPA imposed the same duty on SCS. But we need not answer any questions as to PenFed's duties under the FCRA to resolve the case before us today.

We reach a narrower conclusion better aligned with the record and arguments before us. In light of Wood's history of communications with PenFed, the fact that he had not paid any portion of the debt, and his continued personal belief that

the debt was inaccurate, it would be wrong to say that Wood no longer disputed his debt at the time that SCS reported it to credit reporting agencies. That means that SCS's failure to communicate Wood's dispute was false information for the purposes of §1692e(8) of the FDCPA.

Consequently, we must address whether SCS knew or should have known about Wood's dispute. We answer the easier part first. Did SCS know about Wood's dispute? As Wood concedes, it did not. More complicated is whether SCS *should* have known.

To answer that question, we first need to construe §1692e(8)'s "known or which should be known to be false" language. Section 1692(e) provides:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> ....
>
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

Our view is that §1692e(8) creates a negligence standard.[3] In *Ewing*, our analysis rephrased "which should be known"

---

[3] The opening sentence of §1692e provides that the FDCPA is violated whenever a debt collector "use[s]" a "false representation ... in connection with the collection of any debt." In alignment with this language, we have

as "should have known," and we agree today that the meaning of those phrases is the same. 24 F.4th at 1153. In other contexts, we have repeatedly acknowledged that "knew or should have known" is a "negligence" standard. *See, e.g.*, *Alcala v. Emhart Indus., Inc.*, 495 F.3d 360, 365 (7th Cir. 2007); *United States v. Ladish Malting Co.*, 135 F.3d 484, 488 (7th Cir. 1998); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1022 (7th Cir. 1997). We recognize the same here.

We further conclude that §1692e(8) holds debt collectors to a duty of reasonable care not to report false information, which would be typical for a negligence standard. *See, e.g.*, *Jeffords v. BP Prods. N. Am. Inc.*, 963 F.3d 658, 661 (7th Cir. 2020) (under Indiana law, a plaintiff asserting a negligence claim must prove that the defendant breached the duty to "exercise reasonable care under the circumstances"); *Lees v. Carthage Coll.*, 714 F.3d 516, 522 (7th Cir. 2013) ("The duty of care in Wisconsin negligence law is simply stated as the duty to exercise reasonable care under the circumstances.").

---

said that the FDCPA is a "strict liability statute—a collector 'need not be deliberate, reckless, or even negligent to trigger liability....'" *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 646 (7th Cir. 2009) (quoting *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 495 (7th Cir. 2007)); *Woods v. LVNV Funding, LLC*, 27 F.4th 544, 549 (7th Cir. 2022) (same). Of course, the bona fide error defense can relieve debt collectors from that strict liability.

Wood advances his claim through §1692e(8), so we restrict our analysis to that provision and its "which should be known" language. However, the enumerated violations that follow §1692e's broad opening sentence, including e(8), are listed "[w]ithout limiting the general application of the foregoing." We do not rule on whether Wood could have also sustained his claim under §1692e's general prohibition on false representations, under the theory that a debt collector reports a debt "in connection with the collection" of that debt.

The FDCPA's text does not support a higher standard. It does not say, for example, that a debt collector violates §1692e(8) if it reports false information "which should be known to more likely than not be false." So while a §1692e(8) plaintiff must prove by a preponderance of the evidence that a debt collector should have known about his dispute, as usual in civil litigation, he need not demonstrate that it was "more likely than not" that his debt was disputed. Such a requirement would conflate the burden of proof with the standard of care. We struggle to imagine another situation where we would require a plaintiff claiming negligence to prove that the defendant should have known that its actions were more likely than not to cause the specific injury that occurred.

Under a negligence standard, and the facts in this case, the question is whether SCS used reasonable care to obtain information on whether the debts it purchased were disputed. Recall that SCS bought the bundle without any dispute history attached to individual accounts, and then categorized all of the purchased debts as "undisputed" for reporting purposes. But this is not a case about SCS trusting PenFed to deliver the correct accounts. It is about what SCS thought it was buying.

Namely, Wood says that SCS should have known his debt was disputed because it shared PenFed's legally inaccurate understanding of what constitutes a disputed account when it purchased the debts. We agree with Wood that if SCS purchased a bundle of debts based on a mistaken interpretation of law, that bears upon whether SCS should have known that any information it later communicated about one of those debts was false. While we are still analyzing the elements of Wood's affirmative case, we borrow a principle from the bona fide error defense: debt collectors cannot rely on errors of law

to excuse their conduct. *See Evans,* 889 F.3d at 349–50. Said differently, we are assessing whether an FDCPA violation "result[ed]" from SCS's "incorrect interpretation of the requirements of that statute." *Jerman*, 559 U.S. at 605.

The record evidence is clear that SCS did not initially know of PenFed's letter, or Wood's failure to respond to the letter. The record evidence is mixed as to whether had SCS known of the letter, it would have shared PenFed's perspective that Wood's failure to respond meant that he no longer disputed the debt. On one hand, deposition testimony from SCS's Rule 30(b)(6) corporate representative indicates that SCS did endorse PenFed's view. The representative, SCS's president, concurred with the statement that "because [Wood] didn't respond, according to the policies and your understanding of how PenFed works, because he didn't respond, that's a communication that he agrees with the result." She further testified that PenFed's and SCS's definitions of unresolved dispute matched, that SCS would have considered Wood's dispute to be resolved, and that the account information communicated by PenFed was complete without mentioning Wood's dispute.

On the other hand, SCS's written policies show that it reports debts as disputed regardless of investigation results. Specifically, if an account is verified as accurate and/or the dispute is otherwise considered "resolved," the account continues to be reported "in a disputed status (XB) in order to comply with the FDCPA[.]" In seeming alignment with this policy, SCS began reporting Wood's debt as disputed soon after it learned about this litigation. And at around the same time, SCS emailed PenFed asking for indemnification on Wood's claim, saying that "it appear[s] to stem from an

account that should not have been included in a sale." Plus, SCS's 30(b)(6) representative left room for the possibility that her testimony was imprecise, saying she would have to ask the company's credit reporting expert how exactly they would treat accounts like Wood's.

At summary judgment, we cannot pick a side on the conflicting evidence of whether SCS embraced PenFed's view of an "unresolved dispute" and therefore adopted the risk that accounts like Wood's would be included in the bundle. Yes, the SCS representative's deposition testimony appears to be rebutted by SCS's written policies and contemporaneous reaction to the onset of this litigation. But despite that stark contrast, we "must refrain from making credibility determinations or weighing evidence[.]" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Nor can we disregard the deposition evidence in the record. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to parts of materials in the record, including *deposition*s....") (emphasis added); *see also Co-Operative Shippers, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 840 F.2d 447, 453 (7th Cir. 1988) (holding that defendant company employee's deposition testimony about the company's practices created a genuine issue of material fact).

The factual issue here is material. If SCS believed that accounts like Wood's were properly included in the bundle, that likely means the entire bundle of accounts purchased by SCS was tainted by a mistake of law. In that scenario, it is reasonably foreseeable that disputed debts would be purchased. Therefore, SCS should have known that at least one of the accounts could be disputed, and so SCS would violate the

FDCPA whenever it falsely reported a particular account as undisputed. And because PenFed did not include a dispute history for the purchased accounts, SCS would have been unable to look at the records for an individual account and make an independent conclusion about whether it was disputed for FDCPA purposes. Put another way, SCS's reporting would have been negligent because a legal error meant that SCS failed to exercise reasonable care when it purchased the bundle. Conversely, if SCS thought it was not purchasing accounts like Wood's, there would likely be no FDCPA violation. It would be PenFed's error to include disputed accounts in the bundle, and we do not see evidence in the record that it would have been negligent for SCS to rely on PenFed's representations and warranties.

We acknowledge that based on the evidence presented, the Purchase Agreement did not deliver a large number of disputed accounts into SCS's hands. SCS has purchased over 14,000 accounts from PenFed, yet apart from this litigation, SCS is unaware of any other instance where an account was the subject of a dispute. Nevertheless, if it is true that SCS purchased the bundle under legally inaccurate premises, we highly doubt that the only disputed account included would be Wood's account. Moreover, SCS did not establish at summary judgment that any audit determined the remaining debts to be valid and undisputed. Not every person impacted by the inaccurate reporting of a disputed debt will complain or file a lawsuit.

Furthermore, as discussed when laying out the standard, we reject the proposition that SCS would have been negligent only if a majority of the 14,000 accounts were disputed. Under that reasoning, we would conclude that SCS was not

negligent even if it made a legal mistake that led to 6,999 false reports that a debt was undisputed. There is no basis to deem a course of action that leads to a 49.9% error rate "reasonable care."

"In deciding a motion for summary judgment, neither the district court nor this court may assess the credibility of witnesses ... or balance the relative weight of conflicting evidence." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). The current record tells two different stories about what SCS intended to purchase and how SCS understood its FDCPA reporting obligations. We cannot pick between them. Perhaps SCS's president was mistaken about her company's views. However, at summary judgment, we will not simply credit record evidence that contradicts the statements of SCS's president.

Finally, while SCS has argued that the bona fide error defense means we should affirm even if Wood could establish the elements of his case, we disagree. As explained above, Wood's affirmative case and SCS's bona fide error defense are entangled. If there is an FDCPA violation here, it stems from a mistake of law, not a "clerical or factual mistake" regarding Wood's account. *Jerman*, 559 U.S. at 587. That is precisely the situation where the bona fide error defense is unavailable.

### III. Conclusion

This appeal required us to confront the threshold question of Wood's standing and then the merits of his claim, both of which are difficult issues. We observe that while the "mistake of law" issue was raised to the district court, the way that it intersected with Wood's affirmative case did not crystallize until this appeal. Ultimately, we conclude that Wood has

standing and that there are genuine issues of material fact. Therefore, we reverse and remand for further proceedings consistent with this opinion.