In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1279

WISCONSIN VOTER ALLIANCE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DON M. MILLIS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:23-cv-01416-WCG — **William C. Griesbach**, *Judge*.

ARGUED SEPTEMBER 11, 2025 — DECIDED FEBRUARY 10, 2026

Before BRENNAN, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges*.

PER CURIAM. As with every plaintiff who sues in federal court, an issue-advocacy group must show it has Article III standing. That can arise from concrete injuries to its members or because the defendant "directly affected and interfered" with the group's "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). And just like an individual plaintiff, an organization must prove its claimed

injuries amount to more than a "bare procedural violation" of federal law. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016).

The Wisconsin Voter Alliance, an organization dedicated to advancing election integrity, wants Wisconsin to better administer federal election law. In the Alliance's view, the Commissioners of the Wisconsin Elections Commission need to enforce certain voter-ID laws more strictly and alter the way they manage voter registration lists. So the Alliance filed a complaint with the Commission, asserting that the Commissioners themselves failed to uphold Congress's commands. When the Commissioners declined to review the complaint, the Alliance and two of its members sued in federal court to compel a response.

Before reaching the merits, the district court dismissed this case for lack of subject matter jurisdiction, concluding that neither the Alliance nor its members had Article III standing. Because the district court properly applied the tests for identifying intangible "injuries in fact" and organizational standing, we affirm.

**I**

In 2002, Congress passed the Help America Vote Act (HAVA or the Act) to "establish minimum election administration standards for federal elections." *United States v. Town of Thornapple*, 143 F.4th 793, 796 (7th Cir. 2025) (quoting Pub. L. No. 107-252, 116 Stat. 1666) (citation modified). The Act required states to standardize voting systems, maintain computerized voter registration lists, and more—all to minimize the risk of repeating the controversies of the 2000 presidential election. *Id. See also* 52 U.S.C. §§ 21081–21085.

HAVA includes two enforcement mechanisms. First, the Attorney General can institute a civil action against noncompliant states. 52 U.S.C. § 21111. Second, each State that accepts federal funding under the Act must "establish and maintain State-based administrative complaint procedures." 52 U.S.C. § 21112(a)(1). "Any person who believes that there is a violation" of HAVA "may file a complaint" with an authorized state agency. 52 U.S.C. § 21112(a)(2)(B) (citation modified).

Wisconsin chose to take federal funds, so it designated the Wisconsin Elections Commission to hear HAVA complaints. Wis. Stat. § 5.05(1) (2025). The Commission must abide by federal procedural requirements. For example, the Act outlines a timeline for resolving complaints and an option for holding hearings on the record. 52 U.S.C. §§ 21112(a)(2)(E), (H)–(I). It also explains how States should adjudicate complaints on the merits. If "there is a violation" of HAVA, the State "shall provide the appropriate remedy." § 21112(a)(2)(F). But if "there is no violation, the State shall dismiss the complaint." § 21112(a)(2)(G). Wisconsin adopted many of these provisions into its election code. Wis. Stat. §§ 5.061(1)–(4).

The Wisconsin Voter Alliance knows these procedures well. Since 2020, the Alliance has filed more than ten HAVA complaints with the Commission, several of which turned into state-court lawsuits. When the Alliance's President, Ron Heuer, describes the group's "core organizational and advocacy activities," he highlights the importance of HAVA complaints to their strategy. Without these "governmental tools," he contends the Alliance would struggle to educate both its members and the public on threats to their rights. The Alliance would also lack the information needed to recommend new laws or agency procedures to ensure election integrity.

Whenever "government officials, agencies, or departments fail to cooperate in disclosing facts" under laws like HAVA, Heuer declares, the Alliance's mission "is impeded," which "require[s] the organization to take action by available means."

This case concerns two complaints the Alliance filed against the Wisconsin Elections Commission. In 2022 and 2023, the Alliance, Heuer, and member Kenneth Brown alleged that the Commissioners themselves violated HAVA. In one complaint, they faulted the Commissioners for sharing Wisconsin's statewide voter registration database with other state actors; in another, they objected to a practice of overseas voters bypassing voter-ID requirements.

Rather than answering these complaints, however, the Commissioners announced their "ethical recusal." Following the Wisconsin Supreme Court's lead, they concluded "it would be nonsensical to have [the Commission] adjudicate a claim against itself." *Teigen v. Wis. Elections Comm'n*, 976 N.W.2d 519, 533 (Wis. 2022) (plurality opinion). Still, the Commissioners did "not wish to leave" the Alliance "without a path forward," so they offered three alternatives. First, the Commissioners authorized the Alliance to refer the matter to a district attorney. *See* Wis. Stat. § 5.05(2m)(c)11. Next, the Alliance could "appeal the decision of the commission" to a state trial court. Wis. Stat. § 5.06(8). Finally, the Commissioners noted that ordinary administrative review may also be available. *See* Wis. Stat. § 227.52.

The Alliance chose another path. Shortly after the Commissioners denied their second complaint, the Alliance, Heuer, and Brown sued the Commissioners in federal court. In their view, HAVA's procedural requirements create private

rights enforceable via 42 U.S.C. § 1983. Because the Alliance, Heuer, and Brown offered only minimal allegations of harm, though, the Commissioners moved to dismiss the claim for lack of Article III standing. The district court agreed and dismissed the case, but it gave the plaintiffs leave to refile "because of the strong public interests in the integrity of elections." After they amended their complaint, the district court denied their motion for summary judgment and dismissed the case for lack of subject matter jurisdiction. FED. R. CIV. P. 12(h)(3) & 56(f)(1). Again, neither the Alliance nor the individual plaintiffs offered enough evidence of harm to establish standing. They timely appeal.

## II

This case hinges on whether the Alliance, Heuer, and Brown have suffered an "injury in fact" sufficient to confer Article III standing. They do not, however, allege anything resembling a traditional tangible injury, financial or physical. Instead, they claim to have been injured by the Commissioners' decision to return their complaint without a decision on the merits.

To allege injury in fact, the plaintiffs invoke two distinct, evolving strands of the Supreme Court's standing jurisprudence: intangible injuries and organizational standing. Over the last five years, the Supreme Court has revisited the tests for both subjects. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–30 (2021) (intangible injury); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024) (organizational standing). Though the federal courts of appeals have debated the meaning of these cases, the Supreme Court has yet to resolve any

resulting disputes.[1] Accordingly, we first address the intangible injury theories before turning to organizational standing.

"We review a decision to dismiss for lack of standing de novo." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024). A plaintiff's "burden to demonstrate standing changes as the procedural posture of the litigation changes." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1189 (7th Cir. 2021) (citation omitted). "Where, as here, the procedural posture is summary judgment," the plaintiff must provide "specific facts" supporting standing—a higher burden than at the pleading stage. *Id.* at 1189–90 (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992)).

### III

All three plaintiffs assert intangible injuries. They argue that any time a state agency does not follow 52 U.S.C. § 21112(a) to the letter, they have an injury in fact—without showing additional harm. In the alternative, they characterize failures to abide by these procedures as violations of the Petition Clause of the First Amendment.

### A. Intangible Injury Framework

Article III standing is a "bedrock constitutional requirement," and we cannot reach the merits of a case without it. *Hippocratic Med.*, 602 U.S. at 378 (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To establish Article III standing, plaintiffs must show they suffered an "injury in fact" that was "caused by the defendant and redressable by the court."

---

[1] *See, e.g.*, *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 3–5 (2023) (dismissing a case that would have addressed a circuit split on certain forms of intangible injuries as moot).

*TransUnion*, 594 U.S. at 423. When seeking prospective relief, like a declaratory judgment or an injunction, plaintiffs also "must establish a sufficient likelihood of future injury" to secure standing. *Hippocratic Med.*, 602 U.S. at 381; *Simic v. City of Chicago*, 851 F.3d 734, 738–39 (7th Cir. 2017).

An injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423. A "concrete" injury has a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022) (quoting *TransUnion*, 594 U.S. at 425) (citation modified). Without such an injury, "there is no case or controversy for the federal court to resolve." *Wood v. Sec. Credit Servs., LLC*, 126 F.4th 1303, 1308 (7th Cir. 2025) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

Concrete injuries come in two varieties: tangible and intangible. Tangible injuries, like monetary and physical harms, "readily qualify as concrete injuries." *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 708 (7th Cir. 2024) (citation omitted). Intangible harms can also be concrete if they have a "historical or common-law analog" that is "tortious." *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 979 (7th Cir. 2023). Examples include harms resembling defamation, false light, disclosure of private information, intrusion upon seclusion, and abuse of process. *Freeman*, 113 F.4th at 708; *TransUnion*, 594 U.S. at 425. Violations of some constitutional rights also qualify as intangible injuries. *Spokeo*, 578 U.S. at 340.

A "bare procedural violation" of a federal statute, however, does not count as an intangible injury. *Id.* at 342. That means Congress cannot "enact an injury into existence" simply by creating a private right of action. *TransUnion*, 594

U.S. at 426. "[D]eprivation of a procedural right," without showing "some concrete interest that is affected by the deprivation," does not establish Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

At the same time, "both history and the judgment of Congress play important roles" for the standing inquiry because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 578 U.S. at 340. The Supreme Court has long recognized that Congress can "elevat[e] … concrete, *de facto* injuries that were previously inadequate in law" to "the status of legally cognizable injuries" by creating a private right of action. *Lujan*, 504 U.S. at 578. Intangible injury cases based on violations of federal law, then, direct us to examine the text of the underlying statute—even though standing is a "threshold question that must be resolved … before proceeding to the merits." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998).

## B. Injuries for Procedural Violations under HAVA

The Alliance, Heuer, and Brown cannot satisfy *TransUnion*'s intangible injury test. If an asserted injury has no common-law analog, raises no constitutional concerns, and cannot be enforced through an express right of action, a plaintiff does not have standing. Neither of their theories clears this bar.

### 1. *Implied Rights Theory*

To start, the plaintiffs have not shown that violations of HAVA's procedural requirements are injuries per se. They do not point to any historic form of action, in tort or otherwise, permitting citizens to sue the government for failing to follow statutory procedures without some additional concrete

injury. Indeed, they cannot: *Spokeo* and *TransUnion* identify private injuries, like defamation or invasion of privacy, as characteristic intangible injuries—not public-oriented grievances about government policies. *TransUnion*, 594 U.S. at 425.

To the extent the plaintiffs think the Commissioners denied access to something tangible (a "response" on the merits of their specific complaint), they merely redefine procedural concerns as substantive. The Supreme Court narrowly constrains the tangible injury category to "physical or monetary" harms. *Id.* Without proof of financial losses or bodily harm, plaintiffs must allege intangible injuries that pass muster under the Supreme Court's historical analog test.[2]

The plaintiffs believe, however, that they can bypass the normal standing inquiry in this case. So long as a federal statute creates a private right, they contend, a plaintiff can establish standing just by pointing to that statutory violation (if the relevant agency action impacts them directly). This argument follows from their merits theory: HAVA's procedural provisions create a private right to receive an adjudication on the merits of their complaint, enforceable via 42 U.S.C. § 1983. At oral argument before us, they asserted, "Congress determined the harm was the state officials … violating HAVA," and that "harm" could establish standing without showing anything more. Oral Arg. at 27:19–27:31.

---

[2] At best, this argument characterizes the relevant harm as an "informational injury." *See FEC v. Akins*, 524 U.S. 11, 20–21 (1998). But there is no informational injury here, because there has been no "*denial of information subject to public disclosure*" under a sunshine law, like the Freedom of Information Act. *Casillas*, 926 F.3d at 338 (emphasis original). The Alliance, Heuer, and Brown do not seek information at all; they want legal remedies to resolve the concerns raised in their complaints.

*TransUnion* forecloses this argument. Congress cannot use "its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 426 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)). Of course, the judgment of Congress matters for standing. But it cannot make a state official's failure to abide by the law "harmful" unless that action maps onto a historical tort analog. The Alliance, Heuer, and Brown, then, make an argument that looks more like the *TransUnion* dissent than its majority opinion.

Even if we adopted this theory, the Alliance, Heuer, and Brown would lack standing. Congress has not created a private right of action for individuals to enforce HAVA in federal court. *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019) ("HAVA creates no private cause of action."). "By its text, the HAVA only allows enforcement via attorney general suits or administrative complaint." *Am. C. R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 184–85 (3d Cir. 2017). The judgment of Congress, therefore, is not relevant to analyzing standing in this case because Congress has not weighed in on the matter.

Plaintiffs cannot escape these difficulties by claiming HAVA creates implied rights enforceable through § 1983. In almost every Supreme Court case on intangible injuries arising under federal law (not involving a constitutional violation), there has been an express private right of action in the statute. *See, e.g., Lujan*, 504 U.S. at 571–72 ("citizen-suit provision" of the Endangered Species Act of 1973); *Spokeo*, 578 U.S. at 335 (identifying an explicit cause of action to sue for violations of the Fair Credit Reporting Act); *TransUnion*, 594 U.S. at 419 (same); *Summers*, 555 U.S. at 500 (Administrative Procedure Act); *Akins*, 524 U.S. at 19 (federal district court review

of FEC decisions under the Federal Election Campaign Act of 1971). Against such guidance, we should not leap to include § 1983 implied rights cases.

More to the point, these HAVA procedural provisions fail the Supreme Court's test for determining whether a Spending Clause statute creates private rights. "To prove that a statute secures an enforceable right, privilege, or immunity" under § 1983, "a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'" *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (quoting *Gonzaga v. Doe*, 536 U.S. 273, 290 (2002)). The "rare statute" with rights-creating language can be enforced through private suits only if "Congress has [not] displaced § 1983's general cause of action with a more specific remedy." *Id.*; *see also St. Anthony Hosp. v. Whitehorn*, 132 F.4th 962, 971–72 (7th Cir. 2025) (en banc), *cert. denied*, 2025 WL 2949556.

This statute, by contrast, does not include rights-creating language. *See* 52 U.S.C. § 21112(a). It neither describes these procedures as "rights" nor speaks about a discrete class of protected individuals. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–86 (2023). And HAVA lays out a comprehensive, two-pronged remedial scheme directing individuals to air their grievances with state agencies, not federal courts. *See id.* at 186–91. It is no wonder that the Supreme Court, even before it restricted the implied rights doctrine in *Medina v. Planned Parenthood*, disfavored § 1983 claims designed to enforce HAVA. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (petitioners were unlikely to succeed on the merits of their implied rights claim under 52 U.S.C. § 21083(a)(1)(A)). And pre-*Medina* cases finding private rights for certain HAVA provisions never did so for § 21112. *See, e.g.,*

*Colon-Marrero v. Velez*, 813 F.3d 1, 9–22 (1st Cir. 2016) (finding a private right in § 21083(a)(4)(A)); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572–73 (6th Cir. 2004) (same for § 21082(a)). When a plaintiff alleges an intangible injury and implied rights at the same time, a weak merits theory will counsel against finding standing. Procedural injuries cannot survive Article III scrutiny when Congress has not granted a procedural right. *Cf. Lujan*, 504 U.S. at 572 n.7.[3]

Whether or not this "'history-and-judgment-of-Congress' standard for assessing Article III 'injury in fact' … has raised more questions than it answered" is a question for the Supreme Court, not us. *Laufer v. Arpan LLC*, 29 F.4th 1268, 1284 (11th Cir. 2022) (Newsom, J., concurring) (citation omitted). But this case is straightforward, even under *TransUnion*. Both "history and the judgment of Congress" tell us not to treat this alleged violation of HAVA as an intangible harm. *Spokeo*, 578 U.S. at 340. Without further evidence of concrete injury, the plaintiffs' claim is not cognizable in federal court.

### 2. *Petition Clause Theory*

The Alliance, Heuer, and Brown fare no better on their claim of constitutional harm. They believe the Commissioners violated their First Amendment rights under the Petition

---

[3] The Supreme Court's cases about implied rights under § 1983 do not normally discuss standing. At first, the claims in these cases may resemble procedural violations. Yet many involve tangible injuries in fact. *See, e.g.*, *Maine v. Thiboutot*, 488 U.S. 1, 3 (1980) (recovering welfare benefits promised by statute, a financial harm); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 15 (1981) (remedying deprivations of medical care, a physical harm). And other cases involve intangible harms analogous to common-law actions. *See Gonzaga*, 536 U.S. at 277 (disclosure of false sexual assault allegation in violation of FERPA, analogous to defamation).

Clause, which states, "Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances." U.S. CONST. amend. I. Refusing to adjudicate their dispute on the merits, they argue, counts as a deprivation of their right to petition the Government.

The Supreme Court has not analyzed whether plaintiffs can show standing based on a violation of the Petition Clause. But "traditional [intangible] harms may also include harms specified by the Constitution itself." *TransUnion*, 594 U.S. at 425. First Amendment violations are quintessential examples of constitutional harms giving rise to intangible injuries. *Spokeo*, 578 U.S. at 340. Moreover, both the Supreme Court and this court have suggested that the Petition Clause should be treated the same as the Speech Clause. *See McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment."); *Gray v. Lacke*, 885 F.2d 399, 412 (7th Cir. 1989) (we "analyze an alleged violation of the [P]etition [C]lause in the same manner as any other alleged violation of the right to engage in free speech."). So this court does not treat the Petition Clause differently for standing purposes. *Int'l Union of Operating Eng'rs v. Daley*, 983 F.3d 287, 297 (7th Cir. 2020) (upholding a dismissal for lack of standing when plaintiffs "suffered no invasion" of "First Amendment petition clause rights").

Nevertheless, the Supreme Court has foreclosed this argument. As then-Judge Kavanaugh summarized, "the Petition Clause does not provide a right to a response or official consideration" when people submit "petitions to state agencies." *We the People Found., Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007). He drew that conclusion from two cases confirming that "the First Amendment does not impose any

affirmative obligation on the government to listen, [or] to re-spond." *Smith v. Ark. State Highway Emps.*, 441 U.S. 465 (1979); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984). We recently reaffirmed that holding. *See Int'l Union of Operating Eng'rs*, 983 F.3d at 298 (quoting *Smith* and *Knight*). The Petition Clause protects the "right of access" to courts and government forums. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896 (1984)). It does not go further.

The plaintiffs have not alleged a colorable Petition Clause injury. The Commissioners responded to the complaint and offered several pathways to petition the government for re-dress of grievances.[4] And even if they had not suggested these alternatives, there would still be no Petition Clause problem. The Commissioners did not owe a response, so they could not create a constitutional injury.

---

[4] The plaintiffs understood Wisconsin state law to foreclose these rem-edies. They argue Wis. Stat. § 5.05(2m)(c)11 covers only criminal prosecu-tions, not civil actions, while Wis. Stat. § 5.06(8) and Wis. Stat. § 227.52(6) both preclude judicial review of an agency "non-decision."

But the plaintiffs do not point to any judicial opinions interpreting those state laws, instead citing only federal administrative law cases. We could find no state appellate cases interpreting § 227.52(6), and just one considering § 5.05(2m)(c)11 in passing. *See State v. Jensen*, 782 N.W.2d 415, 425 (Wis. 2010). The scope of judicial review under § 5.06(8) also appears to be contested. *See Brown v. Wis. Elections Comm'n*, 16 N.W.3d 619, 623–27 (Wis. 2025) (Kenneth Brown, from this case, was not "aggrieved" by a merits order; no mention of non-decisions). Plaintiffs cannot allege an in-jury under the Petition Clause if these paths are viable.

**IV**

Organizations, not just individuals, can establish standing to sue in federal court. Sometimes, organizations invoke "associational standing," or the ability to sue on behalf of their members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But organizations can also "sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). To establish "organizational standing," a plaintiff "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Hippocratic Med.*, 602 U.S. at 393–94. An advocacy group cannot conjure up standing because of the "intensity of the litigant's interest." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 486 (1982). It must have an actual injury.

The Alliance argues it has organizational and associational standing. Both standing theories fail, though, because any claim of such harm cannot survive at the summary judgment stage.

**A. Organizational Standing**

The Alliance draws its organizational standing theory from the Supreme Court's recent decision in *Hippocratic Medicine*. There, the Court stated that organizations can establish standing when a defendant's actions "directly affected and interfered with [the organization's] core business activities." *Hippocratic Med.*, 602 U.S. at 395. Echoing this language, the Alliance argues that the Commissioners interfered with their "core political activities" by declining to adjudicate their HAVA complaints. In declarations submitted at the summary judgment stage, it affirmed that all its core activities revolve

around using governmental processes "to investigate or complain[] about governmental misdoings" and educate its "membership" and "governmental officials" on its findings. The Alliance believes these declarations are enough to secure standing under the Supreme Court's test.

This approach misses the point of *Hippocratic Medicine*. An organization does not have standing when a government entity frustrates its "abstract social interests" without a cognizable Article III injury. *Hippocratic Med.*, 602 U.S. at 394 (citation omitted). The Commissioners' decision to decline reviewing this complaint was not an injury, and it does not become one just because an advocacy group asserts that HAVA complaints are important to its mission. That approach would make organizational standing more lenient than the bar for individuals. *Cf. id.* at 393–94 ("[O]rganizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."). And it would turn organizational standing into "nothing more than a game of semantics," in which advocacy organizations can simply declare that disfavored government conduct impedes their "core business activities" without further evidence of harm. *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 566 (6th Cir. 2025). Organizations must point to more evidence of concrete disruptions to mission-critical business operations.

Even if it is assumed that filing HAVA complaints counts as a "core" activity, moreover, this case does not involve a "direct[] … interfere[nce]." *Hippocratic Med.*, 602 U.S. at 395. As the Alliance argued in its summary judgment motion, it still can (and does) file HAVA complaints against other parties. The Commissioners declined to respond to two complaints out of many, and they offered several alternative channels for

redressing the Alliance's concerns.[5] Nothing prevents the Alliance from educating voters, raising public concern about the Commission's tactics, or putting pressure on the legislature to reform the law governing election disputes. There is no evidence that the Commissioners' actions threaten the integrity of this group's "advocacy business[]," so the Alliance cannot establish organizational standing. *Id.*

### B. Associational Standing

Just as the Alliance cannot establish standing for its own injuries, it cannot do so in its representative capacity either. For associational standing, an organization must show "at least one of its members would 'have standing to sue in their own right,'" the lawsuit protects interests "germane to the organization's purpose," and the "participation of individual members" is not necessary. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *Hunt*, 432 U.S. at 343) (citation modified).

This claim fails at step one. Heuer and Brown do not "have standing to sue in their own right" because they have not

---

[5] If the Alliance had incurred (or planned to incur) costs pursuing the alternative remedies the Commissioners identified, it might prove organizational standing. But such costs do not amount to imminent injuries in this case. First, the Alliance has averred it will not be pursuing any of these remedies, in part because it does not believe they are available under Wisconsin state law. *Supra* n.4. Second, assuming these pathways are viable, there is still one option that does not incur additional costs—referring the matter to a district attorney under Wis. Stat. § 5.05(2m)(c)11. So long as this cost-free alternative exists, any other potential costs are just "allegations of possible future injury," and not so pressing as to be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (citation modified).

suffered an injury in fact. As discussed in Part III.B, they cannot claim an intangible injury because the Commission's decision not to adjudicate the HAVA complaint on the merits fails the *TransUnion* standing test. And they have not provided enough information to show an actual or imminent financial injury cognizable under Article III.

**V**

Cases involving advocacy groups and intangible injuries are particularly prone to "manufacture[d]" theories of Article III standing. *Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has cautioned us to guard the courthouse gates against procedural injuries masquerading as direct harm. *TransUnion*, 594 U.S. at 440. Permitting standing for these plaintiffs would ignore this instruction.

The district court, then, correctly dismissed this case for lack of standing. The Alliance, Heuer, and Brown have not suffered an intangible injury based on a violation of HAVA's procedural requirements. And the Alliance cannot establish organizational or associational standing based on the record it has developed in this case.[6]

AFFIRMED

---

[6] Because the Alliance, Heuer, and Brown moved for summary judgment, they had the burden of providing facts sufficient for finding Article III standing at a post-discovery stage. *Persinger*, 20 F.4th 1189. They failed to do so here, even after the district court had dismissed for lack of standing. Accordingly, we decline to return this case to the district court for further factfinding. *See* 28 U.S.C. § 2106.

BRENNAN, *Chief Judge*, concurring. I join the per curiam opinion in full. I write separately to note that this court's organizational standing precedent has been rendered largely obsolete. In *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Supreme Court supplied a new reading of its organizational standing holding from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Our court's caselaw expressly relies on a now-incorrect understanding of *Havens*, seen most clearly in *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). Our precedent should be conformed to the Supreme Court's latest guidance.

The per curiam opinion correctly applies the "core business activities" test outlined in *Hippocratic Medicine*. Given the confusion these parties and district courts have evinced about the governing standard, though, we should clarify the law of Article III standing for this circuit. To do this, I briefly outline the evolution of the Supreme Court's organizational standing caselaw. Then, I examine how *Common Cause* contradicts the new standard. Some questions remain as to the scope of *Hippocratic Medicine's* holding on organizational standing, but *Common Cause* and its progeny no longer control.

## I

### A.  The Supreme Court Modifies the Test

For years, *Havens Realty* was the primary Supreme Court precedent for organizational standing claims. The Court concluded in *Havens* that a group dedicated to housing advocacy activities (HOME) had standing to sue a property management company that engaged in racially discriminatory practices. 455 U.S. at 378–79. HOME adequately alleged an injury in fact to its own interests because it "devote[d] significant

resources to identify and counteract the defendant's" discrimination. *Id.* at 379. The Court found this combination to be "far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes" an injury in fact. *Id.*

Recently, though, the Supreme Court tightened the organizational standing test for public interest groups. In *Hippocratic Medicine*, the Supreme Court cabined *Havens* to its unique facts. 602 U.S. at 394–96. When a group of advocacy organizations challenged the FDA's new rules on mifepristone (an abortifacient pill), they claimed to have standing because they were "incurring costs to oppose FDA's actions." *Id.* at 394. Specifically, they spent money to "conduct their own studies on mifepristone" so they could "better inform their members and the public about mifepristone's risks." *Id.* They also "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (citation modified).

The Court rejected these arguments. An organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394. Rather, it must show how a defendant "directly affected and interfered with [its] core business activities." *Id.* at 395.

To distance itself from the "drain on resources" language in *Havens*, the Court redefined the injury in that case as an informational, rather than a financial, harm. It first emphasized that HOME engaged in more than just issue advocacy—it

"operated a housing counseling service." *Id.*[1] The relevant harm arose when "Havens gave HOME's employees false information about apartment availability." *Id.* Just like a "retailer who sues a manufacturer for selling defective goods to the retailer," Havens Realty "sold" the housing counseling organization defective information, which incidentally incurred costs. *Id.* Ultimately, HOME could not carry out its core business activities under these conditions.

The Court, then, altered the *Havens* organizational standing test in two ways. First, two kinds of spending now qualify as "manufacture[d]" standing after *Hippocratic Medicine*. 602 U.S. at 394. Costs incurred through an organization's "public advocacy" against government action, like "drafting citizen petitions" to an agency, cannot confer standing. *Id.* Nor does standing exist when costs are incurred as part of "public education" efforts, including collecting and distributing information "so that the associations can better inform their members and the public about … risks" of a challenged government action. *Id.* Second, the paradigmatic *Havens* injury is now a direct, non-financial injury to the organization's "core business activities" (like lying to a plaintiff)—not a self-inflicted harm caused by redirecting resources. *Id.* at 395.

Left unanswered in the Supreme Court's opinion is how to tell when a defendant "directly affect[s] and interfere[s]" with an organization's "core business activities." *Hippocratic Med.*, 602 U.S. at 395. As appellate courts face this question,

---

[1] In fact, *Havens* does not describe HOME as a traditional issue-advocacy organization at all: "Its activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." 455 U.S. at 368.

they should heed the Supreme Court's warning that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396.

## B. This Court's Precedent

*Hippocratic Medicine* does not fit with our precedent, so the law of this circuit should be clarified. We have noted that this court's decision in *Common Cause* is "arguably in tension" with *Hippocratic Medicine*. *See Reporters Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 n.3 (7th Cir. 2025). *Common Cause* explicitly relies on *Havens*, applying it because "[n]othing in the Supreme Court's … standing jurisprudence … undermined" its organizational standing holding at the time. 937 F.3d at 950. Now that the Supreme Court has revised the test from *Havens*, that conclusion should be reconsidered.

### 1. The **Common Cause** *Approach*

Taken as a whole, *Common Cause* promotes the "expansive theory of standing" that *Hippocratic Medicine* curtailed. 602 U.S. at 395. In *Common Cause,* this court concluded that several voting rights organizations had standing to challenge an Indiana law revamping that State's procedures for cleaning up its voter rolls. 937 F.3d at 948. In reaching that conclusion, though, it accepted allegations of financial "injuries" that *Hippocratic Medicine* now forecloses.

Most notably, the court credited claims of financial injuries based on "public education" expenses. Each organization said that it "expended resources educating voters and community activists" about the challenged law, including by "chang[ing] [their] curriculum" and reaching out to voters directly. *Id.* at 951–52. One group "created a poster" that informed members of the risk of de-registration. *Id.* at 952. Even at the time, these

alleged costs were "rather thin gruel" for standing purposes. *Id.* at 964 (Brennan, J., concurring). The Supreme Court has now declared them insufficient.

*Common Cause* also relied on diversion of resources language that no longer fits with *Hippocratic Medicine*. The organizations in *Common Cause* believed the Act would force them "to expend … limited financial resources on rolling back the effects of the bill." 937 F.3d at 951. Sometimes, the "effects of the bill" are presented as "concrete work" supporting voters and poll workers; at other points, the opinion shades over into public advocacy more broadly. *But see id.* at 956 ("ruling out standing for lobbying efforts in Indiana's legislature"). Either way, more than once the opinion entangles direct advocacy with voter education. *See id.* at 952 (Common Cause Indiana "devoted additional time and resources to ameliorating the … effects of this law, including conducting … training sessions aimed at educating voters and community activists").

Finally, *Common Cause* did not consider the organizations' "core business activities." *Hippocratic Med.*, 602 U.S. at 395. Instead, this court used a far more elastic concept, "core mission," which more easily justified standing. *Common Cause*, 937 F.3d at 956. The "specific mission[s]" of the organizations were described as multifaceted, including "educating potential voters, helping them to fulfill whatever legal requirements their state has legitimately imposed as a condition of voting, and opposing any improper voter-suppression measures that may exist." *Id.* at 954. Moreover, *Common Cause* calls voter registration "core" to the organizations, but it supplied no evidence of how central these activities were to their day-to-day operations. For example, this court states that Common Cause Indiana's "advocacy agenda … extends far

beyond voter registration." *Id.* at 952. Yet it conflates "voter registration," "voter education," "voter programs," and "voter advocacy," calling them all part of the "core mission" of the organizations at various points. *Id.* at 954. *Hippocratic Medicine* requires more specificity than *Common Cause* provided. *Cf. Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) (remanding for more evidence showing "that the conduct challenged in the suit interfered with the organization's 'core business activities.'").

Reading *Common Cause* on its own terms, nearly every large, well-funded advocacy organization could establish standing in its own right. It would just have to point to a portion of its operations and call them "core." That fully recognizes the fears in *Hippocratic Medicine* of granting "all the organizations in America … standing to challenge almost every … policy that they dislike, provided they spend a single dollar opposing those policies." 602 U.S. at 395. As noted in the per curiam, this approach would turn organizational standing into "nothing more than a game of semantics," where organizations redefine their "missions" at higher levels of generality to secure standing. *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 566 (6th Cir. 2025).

*Hippocratic Medicine* encourages courts to avoid these games. Instead, they should employ a more objective inquiry, looking to both the organization's actual "activities" and the way the defendant's actions impact them. Courts in this circuit, therefore, should no longer follow *Common Cause*'s approach to organizational standing in light of the Supreme Court's latest guidance.

### 2. *Applying* Hippocratic Medicine

The Supreme Court has not explicitly overruled *Havens*. Nor did the Court explain what to do with the discussion of financial injury in that case. It may be that all "diversion of resources" theories of organizational standing are on their way out after *Hippocratic Medicine*, but that is not yet clear. How, then, should organizational standing disputes be handled under this modified precedent?

After *Hippocratic Medicine*, it seems that courts are to first look for instances in which the defendant directly injured the plaintiff organization. Consonant with Article III, these harms could be either tangible or intangible. In *Havens*, the primary injury HOME alleged was an intangible injury. The housing corporation "provided … black employees false information about apartment availability." *Hippocratic Medicine*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 366 and n.1, 368). Under the *TransUnion* test, this kind of racial discrimination resembles actions for fraud and tortious interference at common law, both harmful to HOME's "housing counseling" business. *Id.* at 395. This falsehood, not any financial harm, constitutes the paradigmatic *Havens* injury. Accordingly, an organization would have standing to sue for an intangible injury if an agency defrauded the organization, violated its constitutional rights, or committed something resembling a privacy tort directly against the organization.

This inquiry may be more difficult when a plaintiff asserts that the government caused financial harms. Almost inevitably, a plaintiffs' concerns will look more like a taxpayer suit or "generalized grievance." *Carney v. Adams*, 592 U.S. 53, 58–59 (2020). But if a government entity issued a fine or withheld

grant funding, the organization would likely have a direct tangible financial injury. *TransUnion*, 594 U.S. at 424–25.[2]

If the organization cannot show that a defendant's actions constitute direct concrete harm, whether tangible or intangible, the "core business activities" test takes center stage. Although not crystal clear, *Hippocratic Medicine* does not expressly forbid all financial organizational injury claims. *Cf. Lee*, 139 F.4th at 564–65 (highlighting conflict with normal standing rules if financial harms were not injuries in fact). So, courts would then have to ask whether a defendant "directly affected and interfered with [the plaintiff's] core business activities," causing the plaintiff to incur a financial injury. *Hippocratic Med.*, 602 U.S. at 395. Of course, an advocacy organization still "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. Thus, issue-advocacy groups would only satisfy Article III scrutiny when they allege genuine financial harms caused by the defendant, as the Supreme Court ruled in *Havens*. *Hippocratic Medicine* tells us that these situations will be exceedingly rare. 602 U.S. at 396.[3]

---

[2] It is unclear whether the "core business activities" test should be applied to instances of direct, cognizable harm. Doing so would risk violating the maxim that "organizations must satisfy the usual standards" for standing because it may require organizations to provide more proof of harm than individuals. *Hippocratic Med.*, 602 U.S. at 393–94.

[3] The language about financial injuries cannot be read out of *Havens* so easily, even if that case is limited to "its context." *Hippocratic Med.*, 602 U.S. at 396. *Havens* involved a claim for damages, not injunctive relief. 455 U.S. at 378. The Court made clear that these tangible financial injuries ("the consequent drain on the organization's resources") justified Article III standing. *Id.* at 379. After all, the measure of HOME's recovery would be based on its administrative costs, not the falsity of the defendant's

Until the Supreme Court clarifies whether *Havens* is still good law, though, this court must raise the bar for alleging standing in these cases. Organizations must provide more evidence of harm in their pleadings and through discovery. They must point to facts allowing a reasonable factfinder to conclude that the defendant interfered with a core business activity, not just a vaguely defined core mission. And they cannot rely on any costs pertaining to educating the public or issue advocacy. Without meaningful evidence of how an organization spends its time and money, organizations could redefine their purpose to plead standing. And without showing that the financial injuries are not advocacy costs, organizations could spend their way into court as they wished.

## II

As the per curiam opinion notes, the Wisconsin Voter Alliance provided little evidence in support of its "core business activities" argument. This is because the Alliance changed its standing theory halfway through the litigation. At first, the Alliance argued it had standing because the Commissioners' "non-decision" forced it "to divert resources to education and other non-litigation methods to enjoin the HAVA violations." It also had to "pursue judicial remedies," which "diverts monetary resources away from its core mission and objectives." After *Hippocratic Medicine*, though, the Alliance tried to re-

---

statements. This meant that there was a fit between the asserted injury and the claimed remedy—in other words, the harm was redressable. But reading *Hippocratic Medicine* literally, we might conclude that organizations have standing under *Havens* only when they have an *intangible* injury, not a *tangible* financial injury. That would invert the Supreme Court's normal presumptions about standing. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (tangible harms are presumed "synonymous" with concreteness).

frame its standing argument in terms of its "core political activities." On appeal, it reiterates only the new arguments.

Federal appellate courts have an independent obligation to assure themselves that standing exists. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1010 (7th Cir. 2021). We should therefore carefully consider any arguments for standing supported by the record—even those the plaintiffs downplay before this court.

In its reply brief, the Alliance correctly recognized that its reliance on a diversion of resources theory was a "bad fact" in the record pointing against standing. It saw that the old way of establishing standing—pointing to de minimis costs incurred in response to the defendant's disfavored actions, as this court permitted in *Common Cause*—no longer fit with the Supreme Court's modified approach. Rightly so. The bare recitals of public education expenses offered in the Alliance's amended complaint run afoul of *Hippocratic Medicine*'s prohibition on "manufacture[d]" standing. 602 U.S. at 394.

Other litigants have not picked up on this change so quickly. In several recent district court opinions from this circuit, the litigants expressly relied on a diversion of resources theory to establish organizational standing. Many of these courts have applied *Common Cause*, even after *Hippocratic Medicine*, because "[t]he Seventh Circuit has not yet considered what effect *Hippocratic Medicine* has on *Havens* and its precedents." *Kidd v. Pappas*, No. 1:22-cv-07061, 2025 WL 3507374, at *5–6 (N.D. Ill. Dec. 8, 2025).[4] Other cases have

---

[4] *See, e.g.*, *Nat'l Fair Housing All. v. Deutsche Bank Nat'l Tr.*, No. 1:18-cv-00839, 2025 WL 975967, at *6–7 (N.D. Ill. Mar. 31, 2025); *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 1:24-cv-01867, 2025 WL 2712209, at *7 n.5 (N.D.

conflated the diversion of resources test with the "core business activities" standard in ways that are not faithful to either approach.[5] This uncertainty about our circuit precedent, notwithstanding the ruling in *Hippocratic Medicine*, shows the need for clarity.

Though the Alliance tried to disregard its erroneous "diversion of resources" theory on appeal, it also misunderstood the "core business activities" test. It thought the best way to satisfy *Hippocratic Medicine* would be to strip out all references to financial injuries from the record and its briefing. By doing so, it assumed the new standard could be satisfied without pointing to any injury at all, whether direct harms cognizable under Article III or downstream monetary consequences.

That is not correct. When an organization's intangible injury arguments fail, it does not escape the strictures of Article III. Instead, *Hippocratic Medicine* shows that these organizations must allege a direct injury in fact or else risk dismissal for lack of standing. *Hippocratic Med.*, 602 U.S. at 393–94. The

---

Ill. Sept. 23, 2025). *See also Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co., LLC*, No. 1:11-cv-00612-TAB-JPH, 2024 WL 3859997, at *2–3 (S.D. Ind. Aug. 19, 2024); *Reporters Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 940–42 (S.D. Ind. Sept. 27, 2024); *Access Living of Metro. Chi., Inc. v. City of Chicago*, 752 F. Supp. 3d 922, 928 (N.D. Ill. Sept. 30, 2024); *Ill. Nurses Ass'n v. Rosenblatt*, No. 1:24-cv-12379, 2025 WL 2430571, at *3 (N.D. Ill. Aug. 22, 2025).

One district court applied *Common Cause* with trepidation, recognizing that *Hippocratic Medicine* may unsettle this court's precedent. *See Legal Aid Chi. v. Hunter Props.*, No. 1:23-cv-04809, 2024 WL 4346615, at *5–14 (N.D. Ill. Sept. 30, 2024) (Seeger, J.).

[5] *See Chi. Headline Club v. Noem*, No. 1:25-cv-12173, 2025 WL 3240782, at *74–75 (N.D. Ill. Nov. 20, 2025).

"core business activities" test does not stand apart from the "usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 394. Rather, the test fits into the framework by delineating the circumstances in which a defendant does (and does not) cause a tangible financial injury to an organization. *Cf. Lee*, 139 F.4th at 564–65 (discussing causation). Of course, the Alliance must show a real injury to establish this kind of harm—not just self-inflicted financial inconvenience. Without an intangible injury, it must identify a financial harm to even enter Article III's ambit.

Because the district court dealt with the Alliance's diversion of resources theory and the defendant litigated it before this court, this topic—including resetting the applicable law—was properly presented for our review and clarification of the law of this circuit.

### III

The Supreme Court has warned to be "careful not to extend the *Havens* holding" on organizational standing "beyond its context." *Hippocratic Med.*, 602 U.S. at 395. The per curiam opinion correctly replaces the old test with the new when it applies the "core business activities" standard. Before *Hippocratic Medicine*, parties and courts were not required to ask about core activities, so the per curiam opinion takes a step in the right direction. At some point the Supreme Court may give further guidance about how the "core business activities" standard fits with the ordinary Article III analysis for tangible and intangible injuries. Until then, parties and district courts should acknowledge this change in the law and adjust their approach to organizational standing.